Jose PADILLA, by Donna
R. NEWMAN, as next
friend, Petitioner,

v.

George W. BUSH, Donald Rumsfeld,
and Commander M.A. Marr,
Respondents.

No. 02CIV445(MBM).

United States District Court,
S.D. New York.

Dec. 4, 2002.

566

Donna R. Newman, New York City, Andrew G. Patel, New York City, for Petitioner.

James B. Comey, United States Attorney for the Southern District of New York, New York City, Paul D. Clement, Deputy Solicitor General, David B. Salmons, Sri Srinivasan, Assistants to the Solicitor General, U.S. Department of Justice, Office of the Solicitor General, Washington, DC, Jonathan L. Marcus, Attorney, Department of Justice, U.S. Department of Justice, Washington, DC, Eric B. Bruce, Assistant U.S. Attorney, New York City, for Respondent.

Steven R. Shapiro, Lucas Guttentag, New York City, for Amicus Curiae American Civil Liberties Union Foundation.

Arthur N. Eisenberg, Christopher T. Dunn, Donna Lieberman, New York City, for Amicus Curiae New York Civil Liberties Union Foundation.

Kate Martin, Washington, DC, for Amicus Curiae Center for National Security Studies.

Donald G. Rehkopf, Law Offices of Brenna & Brenna, Rochester, NY, for Amici Curiae The New York State Association of Criminal Defense Lawyers and The National Association of Criminal Defense Lawyers.

## OPINION AND ORDER

### TABLE OF CONTENTS

I. FACTUAL BACKGROUND ............................................570

II. NEWMAN'S STANDING AS NEXT FRIEND ..............................575

III. THIS COURT'S JURISDICTION ........................................578

 A. Who Is A Proper Respondent? ........................................578
 B. Territorial Jurisdiction ...............................................583
 C. Personal Jurisdiction................................................587
 D. Transfer to South Carolina ..........................................587

IV. THE LAWFULNESS OF PADILLA'S DETENTION ........................587

 A. The President's Authority To Order That Padilla Be Detained As An
 Enemy Combatant....................................................588
 B. Is Padilla's Detention Barred by Statute? ................................596

V. CONSULTATION WITH COUNSEL ......................................599

VI. THE STANDARD APPLICABLE TO THIS COURT'S REVIEW AND THE
 FACTS THE COURT MAY CONSIDER ..................................605

 A. Deference Due the President's Determination ............................605
 B. The Sealed Mobbs Declaration ........................................608

MUKASEY, District Judge.

Petitioner in this case, Jose Padilla, was arrested on May 8, 2002, in Chicago, on a material witness warrant issued by this court pursuant to 18 U.S.C. § 3144 to enforce a subpoena to secure Padilla's testi-

mony before a grand jury in this District. His arrest and initial detention were carried out by the U.S. Department of Justice. As the result of events described below—including the President's designation of Padilla as an enemy combatant associated with a terrorist network called al Qaeda—Padilla is now detained, without formal charges against him or the prospect of release after the giving of testimony before a grand jury, in the custody of the U.S. Department of Defense at the Consolidated Naval Brig in Charleston, South Carolina.

Through his attorney, Donna R. Newman, acting as next friend, Padilla has petitioned pursuant to 28 U.S.C. § 2241, seeking relief in the nature of habeas corpus, challenging the lawfulness of his detention, and seeking an order directing that he be permitted to consult with counsel. He has named as respondents President George W. Bush, Secretary of Defense Donald Rumsfeld, and Commander M.A. Marr, the officer in charge of the brig where he is detained.[1] The government has moved to dismiss the petition on several grounds, including that Newman lacks standing necessary to establish next friend status, and that this court lacks personal jurisdiction over any proper respondent, and over all of those named as respondents. Alternatively, the government moves to transfer the case to the District of South Carolina, where Padilla is held.

As to the merits, the government argues that the lawfulness of Padilla's custody is established by documents already before this court. Padilla argues that the President lacks the authority to detain him under the circumstances present here, including that he is a United States citizen arrested in the United States, and that in any event he must be permitted to consult with counsel.[2] The government has submitted a classified document *in camera* to be used, if necessary, in aid of deciding whether there exists evidence to justify the order directing that Padilla be detained.

For the reasons set forth below, the parties' applications and motions are resolved as follows: (i) Newman may pursue this petition as next friend to Padilla, and the government's motion to dismiss for lack of standing therefore is denied; (ii) Secretary Rumsfeld is the proper respondent in this case, and this court has jurisdiction over him, as well as jurisdiction to hear this case, and the government's motion to dismiss for lack of jurisdiction, or to transfer to South Carolina, is denied; (iii) the President is authorized under the Constitution and by law to direct the military to detain enemy combatants in the circumstances present here, such that Padilla's detention is not *per se* unlawful; (iv) Padilla may consult with counsel in aid of pursuing this petition, under conditions that will minimize the likelihood that he can use his lawyers as unwilling intermediaries for the transmission of information to others and may, if he chooses, submit facts and argument to the court in aid of his petition; (v) to resolve the issue of whether Padilla was lawfully detained on the facts present

1. Initially, Padilla also named Attorney General John Ashcroft as a respondent, but the parties have agreed that he should not be so named, and therefore the petition is dismissed as to him.

2. In addition, two sets of *amici curiae* have filed briefs. In one brief, the New York State and the National Association of Criminal De-

fense Lawyers have argued principally that this court has jurisdiction to review Padilla's detention, and that that detention on its current terms is unlawful. In another brief, the American and New York Civil Liberties Union Foundations, and the Center for National Security Studies (collectively "ACLU"), also argue principally that Padilla's detention on its current terms is unlawful.

here, the court will examine only whether the President had some evidence to support his finding that Padilla was an enemy combatant, and whether that evidence has been mooted by events subsequent to his detention; the court will not at this time use the document submitted *in camera* to determine whether the government has met that standard.

## I. FACTUAL BACKGROUND

The immediate factual and legal predicate for this case lies in the September 11, 2001 attacks on this country, and the government's response. On that date, as is well known, 19 terrorists associated with an organization called al Qaeda hijacked four airplanes, and succeeded in crashing three of them into public buildings they had targeted—one into each of the two towers of the World Trade Center in New York, and one into the Pentagon near Washington, D.C. The World Trade Center towers were destroyed and the Pentagon was seriously damaged. Passengers on the fourth airplane sought to overpower the hijackers, and in so doing prevented that airplane from being similarly used, although it too crashed, in a field in Pennsylvania, and all aboard were killed. In all, more than 3,000 people were killed in that day's coordinated attacks.

On September 14, 2001, by reason of those attacks, the President declared a state of national emergency. On September 18, 2001, Congress passed Public Law 107–40, in the form of a joint resolution that took note of "acts of treacherous violence committed against the United States and its citizens," of the danger such acts posed to the nation's security and foreign policy, and of the President's authority to deter and prevent "acts of international terrorism against the United States." The resolution, entitled "Authorization for Use of Military Force," (the "Joint Resolution") then provided as follows:

That the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons.

Authorization for Use of Military Force, Pub. Law No. 107–40, § 2(a), 115 Stat. 224, 224 (2001).[3] As the term "Public Law" connotes, the President signed the Joint Resolution.

On November 13, 2001, the President signed an order directing that persons

---

**3.** The Joint Resolution provides also, in section 2(b)(1), that it "is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution." Authorization for Use of Military Force, Pub. Law No. 107–40, § 2(b)(1), 115 Stat. 224, 224 (2001). That resolution was enacted in 1973 over Presidential veto, and purported to limit the President's authority and discretion to commit American troops to actual or potential hostilities without specific Congressional authorization. War Powers Resolution, Pub. Law No. 93–148, 87 Stat. 555 (1973) (codified at 50 U.S.C. §§ 1541 *et seq.*). Although President Bush signed the Joint Resolution the day it was passed, he did so while maintaining "the longstanding position of the executive branch regarding the President's constitutional authority to use force, including the Armed Forces of the United States and regarding the constitutionality of the War Powers Resolution." Press Release, Office of the Press Secretary, President Signs Authorization for Use of Military Force Bill (Sept. 18, 2001) (statement by the President), http://www.white house.gov/news/releases/2001/09/20010918–10.html. The constitutionality of the War Powers Resolution is a matter of debate, has never been tested in court—if indeed it could be—and need not be treated in this opinion.

whom he determines to be members of al Qaeda, or other persons who have helped or agreed to commit acts of terrorism aimed at this country, or harbored such persons, and who are not United States citizens, will be subject to trial before military tribunals, and will not have recourse to any other tribunal, including the federal and state courts of this country. He specifically cited the Joint Resolution in the preamble to that order. Mil. Order of Nov. 13, 2001, 66 Fed.Reg. 57,833, 57,833 (Nov. 16, 2001).

As previously noted, on May 8, 2002, this court, acting on an application by the Justice Department pursuant to 18 U.S.C. § 3144,[4] based on facts set forth in the affidavit of Joseph Ennis, a special agent of the FBI, found that Padilla appeared to have knowledge of facts relevant to a grand jury investigation into the September 11 attacks. That investigation included an ongoing inquiry into the activities of al Qaeda, an organization believed to be responsible for the September 11 attacks, among others, and to be committed to and involved in planning further attacks. On May 15, 2002, following Padilla's removal from Chicago to New York, where he was detained in the custody of the Justice Department at the Metropolitan Correctional Center ("MCC"), he appeared before this court, and Donna R. Newman, Esq. was appointed to represent him. After Newman had conferred with Padilla at the

MCC, and following another court appearance on May 22, 2002, Padilla, represented by Newman, moved to vacate the warrant. The motion to vacate the warrant included an affirmation from Padilla obviously drafted by Newman, albeit one that did not discuss any issue relating to the likelihood that he had information material to a grand jury investigation. (Padilla Affirmation) The motion was fully submitted for decision by June 7.

However, on June 9, 2002, the government notified the court *ex parte* that it was withdrawing the subpoena. Pursuant to the government's request, the court signed an order vacating the warrant. At that time, the government disclosed that the President had designated Padilla an enemy combatant, on grounds discussed more fully below, and directed the Secretary of Defense, respondent Donald Rumsfeld, to detain Padilla. The government disclosed to the court as well that the Department of Defense would take custody of Padilla forthwith, and transfer him to South Carolina, as in fact happened.

On June 11, 2002, Newman and the government appeared before this court at the time a conference had been scheduled in connection with Padilla's then-pending motion to vacate the material witness warrant. At that time, Newman filed a habeas corpus petition pursuant to 28 U.S.C. § 2241[5], later to be amended. In response to an inquiry from the court, the

---

**4.** That section provides, in relevant part: "If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this title." 18 U.S.C. § 3144 (2000).

**5.** That section provides, in pertinent part:

(a) Writs of habeas corpus may be granted by ... the district courts ... within their respective jurisdictions.

. . . . .

(c) The writ of habeas corpus shall not extend to a prisoner unless—
 (1) He is in custody under or by color of the authority of the United States ...; or

. . . . .

 (3) He is in custody in violation of the Constitution or laws or treaties of the United States[.]
28 U.S.C. § 2241 (2000).

government conceded that after the June 9 Order was signed, Department of Defense personnel took custody of Padilla in this district. (Tr. of 6/11/02 at 7; *see also* Tr. of 7/31/02 at 17) Newman's petition alleges the facts surrounding Padilla's initial capture and transfer to New York, Newman's activities in connection with representing him, proceedings relating to his motion to vacate the material witness warrant, and his subsequent transfer to South Carolina. (Am.Pet.¶¶ 15–22, 25) Newman has averred that she was told she would not be permitted to visit Padilla at the South Carolina facility, or to speak with him; she was told she could write to Padilla, but that he might not receive the correspondence. (Newman Aff. of 9/24/02 ¶ 8)

In addition to having submitted the above-mentioned affirmation from Padilla in connection with the motion to vacate the material witness warrant, according to the amended petition, it appears that Newman consulted not only with Padilla but also with his family. (Am.Pet.¶ 20) No criminal charges have been filed against Padilla.

The President's order, dated June 9, 2002 (the "June 9 Order"), is attached, in redacted form, to the government's dismissal motion, and sets forth in summary fashion the President's findings with respect to Padilla. Attached as well is a declaration of Michael H. Mobbs ("Mobbs Declaration"), who is employed by the Department of Defense. The Mobbs Declaration sets forth a redacted version of facts provided to the President as the basis for the conclusions set forth in the June 9 Order. In addition to the redacted summary contained in the Mobbs Declaration, the government has submitted, under seal, an unredacted version of information provided to the President ("Sealed Mobbs Declaration"). As set forth more fully below, the government has argued that the Mobbs Declaration is sufficient to establish the correctness of the President's findings

contained in the June 9 Order, although it has made the Sealed Mobbs Declaration available to the court to remedy any perceived insufficiency in the Mobbs Declaration. However, the government has maintained that the Sealed Mobbs Declaration must remain confidential. The government has taken the position that it would withdraw the Sealed Mobbs Declaration sooner than disclose its contents to defense counsel. (Respondents' Resp. to Petitioners' Supplemental Mem. at 11).

The June 9 Order is addressed to the Secretary of Defense, and includes seven numbered paragraphs setting forth the President's conclusion that Padilla is an enemy combatant, and, in summary form, the basis for that conclusion, including that Padilla: is "closely associated with al Qaeda," engaged in "hostile and war-like acts" including "preparation for acts of international terrorism" directed at this country, possesses information that would be helpful in preventing al Qaeda attacks, and represents "a continuing, present and grave danger to the national security of the United States." (June 9 Order ¶¶ 2–5) In addition, the June 9 Order directs Secretary Rumsfeld to detain Padilla. (*Id.* ¶ 6)

The Mobbs Declaration states that Padilla was born in New York and convicted in Chicago, before he turned 18, of murder. Released from prison after he turned 18, Padilla was convicted in Florida in 1991 of a weapons charge. After his release from prison on that charge, Padilla moved to Egypt, took the name Abdullah al Muhajir, and is alleged to have traveled also to Saudi Arabia and Afghanistan. (Mobbs Decl. ¶ 4) In 2001, while in Afghanistan, Padilla is alleged to have approached "senior Usama Bin Laden lieutenant Abu Zubaydeh" (*id.* ¶ 6) and proposed, among other things, stealing radioactive material within the United States so as to build,

and detonate a " 'radiological dispersal device' (also known as a 'dirty bomb') within the United States" (*id.* ¶ 8). Padilla is alleged to have done research on such a project at an al Qaeda safehouse in Lahore, Pakistan, and to have discussed that and other proposals for terrorist acts within the United States with al Qaeda officials he met in Karachi, Pakistan, on a trip he made at the behest of Abu Zubaydah. (*See id.* ¶¶ 7–9) One of the unnamed confidential sources referred to in the Mobbs Declaration said he did not believe Padilla was actually a member of al Qaeda, but Mobbs emphasizes that Padilla had "extended contacts with senior Al Qaeda members and operatives" and that he "acted under the direction of [Abu] Zubaydah and other senior Al Qaeda operatives, received training from Al Qaeda operatives in furtherance of terrorist activities, and was sent to the United States to conduct reconnaissance and/or conduct other attacks on their behalf." (*Id.* ¶ 10)

As mentioned above, Padilla was taken into custody on the material witness warrant on May 8, in Chicago, where he landed after traveling, with one or more stops, from Pakistan. (*Id.* ¶ 11)

Dealing with the contents of the Sealed Mobbs Declaration is problematic. Padilla argues that I should not consider it at all, at least unless his lawyers have access to it and, he argues, he has an opportunity to respond to its contents. The government argues that I must not disclose it, but that I need not consider it because the redacted version of what the President was told, as set forth in the Mobbs Declaration, is enough to justify the June 9 Order, unless for some reason I think otherwise, in which case I am invited to examine it *in camera.* Although neither the government nor Padilla mentions the point, the contents of the Sealed Mobbs Declaration

could relate to another issue—whether, as the government claims, there is a reasonably cognizable risk to national security that could result from permitting Padilla to consult with counsel.

Although Padilla had been under arrest pursuant to the material witness warrant since May 8, his arrest was announced on June 10, after he was taken into Defense Department custody, by the President and by Attorney General John Ashcroft, who made his announcement during a trip to Moscow. *See* James Risen & Philip Shenon, *Traces of Terror: The Investigation; U.S. Says it Halted Qaeda Plot to Use Radioactive Bomb,* N.Y. Times, June 11, 2002, at A1.

Secretary Rumsfeld was questioned at a press briefing on Wednesday, June 12, during a trip to Doha, Qatar, about how close he thought Padilla and others were to being able to build a "dirty bomb," and whether he thought Padilla would be "court martialled."[6] News Briefing, Department of Defense (June 12, 2002), 2002 WL 22026773. In response, Secretary Rumsfeld described Padilla as "an individual who unquestionably was involved in terrorist activities against the United States." *Id.* He said that Padilla "will be held by the United States government through the Department of Defense and be questioned." *Id.* He then added that in order to protect the United States and its allies, "one has to gather as much [ ] intelligence information as is humanly possible." *Id.* Secretary Rumsfeld then summarized as follows how Padilla would be dealt with:

> Here is an individual who has intelligence information, and it is, in answer to the last part of your question—will be submitted to a military court, or something like that—our interest really in his

---

**6.** This was apparently an inartful reference to trial before a military tribunal, a procedure

the President has already declared he will not apply to American citizens. *See supra* p. 571.

case is not law enforcement, it is not punishment because he was a terrorist or working with the terrorists. Our interest at the moment is to try and find out everything he knows so that hopefully we can stop other terrorist acts.

*Id.*

Secretary Rumsfeld distinguished as follows the government's handling of Padilla from its handling of the usual case of one charged with breaking the law:

It seems to me that the problem in the United States is that we have—we are in a certain mode. Our normal procedure is that if somebody does something unlawful, illegal against our system of government, that the first thing we want to do is apprehend them, then try them in a court and then punish them. In this case that is not our first interest.

Our interest is to—we are not interested in trying him at the moment; we are not interested in punishing him at the moment. We are interested in finding out what he knows. Here is a person who unambiguously was interested in radiation weapons and terrorist activity, and was in league with al Qaeda. Now our job, as responsible government officials, is to do everything possible to find out what that person knows, and see if we can't help our country or other countries.

*Id.*

Secretary Rumsfeld offered anecdotal evidence to justify applying to Padilla procedures different from those applied to prisoners arrested in conventional cases:

If you think about it, we found some material in Kandahar that within a week was used—information, intelligence information—that was used to prevent a[t] least three terrorist attacks in Singapore—against a U.S. ship, against a U.S. facility and against a Singaporean facility.

Now if someone had said when we found that information or person, well now let's us arrest the person and let's start the process of punishing that person for having done what he had did, we never would have gotten that information. People would have died.

So I think what our country and other countries have to think of is, what is your priority today? And given the power of weapons and given the number of terrorists that exist in the world, our approach has to [be] to try to protect the American people, and provide information to friendly countries and allies, and protect deployed forces from those kind of attacks.

I think the American people understand that, and that notwithstanding the fact that some people are so locked into the other mode that they seem not able to understand it, I suspect that ... the American people will.

*Id.* Secretary Rumsfeld's quoted statements appear to show both his familiarity with the circumstances of Padilla's detention, and his personal involvement in the handling of Padilla's case.

It is not disputed that Padilla is held incommunicado, and specifically that he has not been permitted to consult with Newman or any other counsel.

Although the immediate predicate for this case lies in the events of September 11 and their consequences, that date did not mark the first violent act by al Qaeda directed against the United States. An indictment styled *United States v. Bin Laden*, No. 98 Cr. 1023, charged defendants allegedly affiliated with that organization in connection with the August 1998 bombing of United States embassies in Nairobi, Kenya and Dar–Es–Salaam, Tanzania. According to that indictment, which was tried to a guilty verdict in the summer of 2001, al Qaeda emerged in 1989, under

the leadership of Usama Bin Laden. *See United States v. Bin Laden*, 92 F.Supp.2d 225, 228–29 (S.D.N.Y.2000). As summarized by Judge Sand, who presided at that trial, the indictment portrayed al Qaeda as a "vast, international terrorist network" that functioned on its own and in cooperation with like-minded groups to oppose the United States through the use of "violent, terrorist tactics." *Id.* "From time to time, according to the Indictment, Bin Laden would issue rulings on Islamic law, called 'fatwahs,' which purported to justify al Qaeda's violent activities." *Id.* at 229. Bin Laden has declared a "jihad" or holy war against the United States. *Id.* at 230.

In addition to the September 11 attack and the 1998 bombings in Kenya and Tanzania, al Qaeda is believed, at a minimum, to be responsible for the October 2000 bombing of the U.S.S. Cole that killed 17 U.S. sailors, and to have participated in the October 1993 attack on U.S. military personnel serving in Somalia that killed 18 soldiers. (*Id.*)

On October 8, 1999, al Qaeda was designated by the Secretary of State as a foreign terrorist organization, pursuant to section 219 of the Immigration and Nationality Act. *See* Designation of Foreign Terrorist Organizations, 64 Fed.Reg. 55,112 (1999). It has also been similarly designated by the Secretary of State under the International Emergency Economic Powers Act. *See* Additional Designations of Terrorism–Related Blocked Persons, 66 Fed.Reg. 54,404 (2001).

## II. NEWMAN'S STANDING AS NEXT FRIEND

■ The first of the several issues presented by this petition concerns Newman's Standing to assert a claim as next friend. The statute, 28 U.S.C. § 2242 (2000), provides that an application for relief thereunder "shall be in writing signed and verified by the person for whose relief it is intend-ed or by someone acting in his behalf." The Supreme Court has explained that this provision was intended to permit a third party to sue as next friend when a prisoner is unable to seek relief himself. *See Whitmore v. Arkansas*, 495 U.S. 149, 162, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("Most frequently, 'next friends' appear in court on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves."). In *Whitmore*, the Court described as follows the requirements for next friend standing:

> "[N]ext friend" standing is by no means granted automatically to whomever seeks to pursue an action on behalf of another. Decisions applying the habeas corpus statute have adhered to at least two firmly rooted prerequisites for "next friend" standing. First, a "next friend" must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest.

*Id.* at 163–64, 110 S.Ct. 1717 (citations omitted).

The Court placed the burden on the next friend "clearly to establish the propriety of his status and thereby justify the jurisdiction of the court." *Id.* at 164, 110 S.Ct. 1717. The Court explained that the limitations on next friend status "are driven by the recognition that '[i]t was not intended that the writ of habeas corpus should be availed of, as a matter of course, by intruders or uninvited meddlers, styling themselves next friends.'" *Id.* (quoting

*United States ex rel. Bryant v. Houston,* 273 F. 915, 916 (2d Cir.1921)). The Court added that "if there were no restriction on 'next friend' standing in federal courts, the litigant asserting only a generalized interest in constitutional governance could circumvent the jurisdictional limits of Art. III simply by assuming the mantle of 'next friend.'" *Id.*

Of the factors listed in *Whitmore* to support a finding of next friend status—inaccessibility of the party in interest, the proposed next friend's dedication to the welfare of that party, and a "significant relationship" between the proposed next friend and that party—the government disputes Newman only as to the last. It argues that Newman's relationship with Padilla is not sufficiently significant to warrant recognizing her as next friend in this case (Mot. to Dismiss Am. Pet. at 8–10), and suggests instead that a member of Padilla's immediate family, if so inclined, might serve in that capacity (*id.* at 10; Respondents' Reply in Supp. of Mot. to Dismiss Am. Pet. at 7–8). Here, the government relies principally on *Hamdi v. Rumsfeld,* 294 F.3d 598 (4th Cir.2002), a case involving a petitioner who is also detained as an enemy combatant, in whose behalf a federal public defender sought to file a habeas corpus petition as next friend. The federal defender in that case had no preexisting relationship with Hamdi, *id.* at 604, and there existed a person known to the federal defender—Hamdi's father—who did have such a relationship, *id.* at 606. Indeed, Hamdi's father petitioned for next friend status. *Id.* The Court said, "[w]e need not decide just how significant the relationship between the would-be next friend and the real party in interest must be in order to satisfy the requirements for next friend standing. It suffices here to conclude that no preexisting relationship whatever is insufficient." *Id.* at 604. The Court reasoned, "[A]bsent a requirement of some significant relationship with the detainee, there is no principled way to distinguish a Public Defender from someone who seeks simply to gain attention by injecting himself into a high-profile case, and who could substantiate alleged dedication to the best interests of the real party in interest by attempting to contact him and his family." *Id.* at 605. Notably, the Court in *Hamdi* explicitly declined to say "that an attorney can never possess next friend standing, or that only the closest relative can serve as next friend." *Id.* at 607.

This case is easily distinguished from *Hamdi.* Here, Newman had a preexisting relationship with Padilla that involved directly his apprehension and confinement. She had conferred with him over a period of weeks in aid of an effort to end that confinement. She submitted at least one affidavit that he signed, and was engaged in attacking the legal basis of his confinement when he was taken into custody by the Defense Department. She is at once the person most aware of his wishes in this case and the person best suited to try to achieve them. It is of no significance whatever that when she and Padilla formed their relationship he was in the custody of the Justice Department and now he is in the custody of a different executive department. The legal issues may have changed, but the nature of the relationship between Newman and her client has not.

Not only does Newman have a significant and relevant relationship with Padilla, but she appears also to have conferred with Padilla's relatives. (*See* Am. Pet. ¶ 20 ("As an additional part of her representation of Mr. Padilla, Petitioner Donna R. Newman ... consulted with both members of Mr. Padilla's family and representatives of the Government. She continues to consult with the Government and Mr. Padilla's family in her role as his attorney.")) She

is certainly neither an "intruder" nor an "uninvited meddler." *Whitmore*, 495 U.S. at 164, 110 S.Ct. 1717.

Despite the government's casual suggestion that some other member of Padilla's family might serve as a next friend in this case (Mot. to Dismiss Am. Pet. at 10; Respondents' Reply in Supp. of Mot. to Dismiss Am. Pet. at 7–8), there is no indication here that any other member of Padilla's family, unlike the detainee's father in *Hamdi*, wishes to assume that role in place of Newman. The government cites several cases in which family members have been granted next friend status, and argues, extravagantly, that those cases show that " '[n]ext friend' standing is typically reserved for those who have a close, *personal* relationship with a detainee—like a parent, spouse, or sibling." (Mot. to Dismiss Am. Pet. at 9) Those cases stand for no such principle. Rather, they involve for the most part capital defendants who have elected to forgo appeals and whose competence is in question. In such cases, courts have permitted family members to intervene as next friends to seek stays of execution. *See, e.g., Vargas v. Lambert*, 159 F.3d 1161, 1168 (9th Cir.1998) (mother had standing to seek stay of execution to allow for hearing on son's competency); *In re Heidnik*, 112 F.3d 105, 112 (3d Cir.1997) (per curiam) (daughter could serve as next friend to stop father's execution upon showing he suffered from paranoid schizophrenia). However, when incompetence has not been shown, courts have denied next friend status even to close relatives. *See Brewer v. Lewis*, 989 F.2d 1021, 1026 (9th Cir.1993) (mother did not have next friend standing because she failed to show defendant was incompetent).

The government quotes selectively from *T.W. by Enk v. Brophy*, 124 F.3d 893 (7th Cir.1997), in an effort to show that a next friend ordinarily should be a relative. However, the Court was concerned in that case specifically with who should serve as a next friend when the real party in interest was a minor child. In such a case, it is obvious that:

> ordinarily the eligibles will be confined to the plaintiff's parents, older siblings (if there are no parents), or a conservator or other guardian, akin to a trustee; that persons having only an ideological stake in the child's case are never eligible; but that if a close relative is unavailable and the child has no conflict-free general representative the court may appoint a personal friend of the plaintiff or his family, a professional who has worked with the child, or, in desperate circumstances, a stranger whom the court finds to be especially suitable to represent the child's interests in the litigation.

*Id.* at 897. That case does not support the government's position here.

The government has informed me that the Ninth Circuit recently decided *Coalition of Clergy v. Bush*, 310 F.3d 1153 (9th Cir.2002), but that case, involving a group of self-appointed "clergy, lawyers and law professors," *id.* at 1156, presents the classic "intruder" and "uninvited meddler" scenario that *Whitmore* found insufficient to confer standing. *See Whitmore*, 495 U.S. at 164, 110 S.Ct. 1717. *Coalition of Clergy* does not read on this case.

Both sides refer to *Lenhard v. Wolff*, 443 U.S. 1306, 100 S.Ct. 3, 61 L.Ed.2d 885 (1979) (Rehnquist, Circuit Justice, in chambers). There, Justice Rehnquist found it telling that a capital defendant's family declined to join in the effort to secure further judicial review of his sentence, and drew the inference that they felt the defendant was competent to waive further proceedings and therefore that the predicate showing of incompetence necessary to permit a next friend petition when the detainee is accessible and can act for

himself had not been made. *Id.* at 1310. However, he also stated his view "that from a purely technical standpoint a public defender may appear as 'next friend' with as much justification as the mother of [one or another capital defendant]." *Id.* As noted above, there is no issue of competence in this case; the reason for seeking next friend standing is inaccessibility, and the government has conceded that.

There being no "technical" impediment to appointing a lawyer to serve as next friend, it is not surprising that courts have done so in appropriate cases. *See, e.g., Miller ex rel. Jones v. Stewart,* 231 F.3d 1248 (9th Cir.2000) (granting next friend status to lawyer seeking to stay execution and remanding for hearing on defendant's competence); *Ford v. Haley,* 195 F.3d 603, 624 (11th Cir.1999) (recognizing that lawyer who had represented petitioner for years was as fit as a relative to serve as next friend); *In re Cockrum,* 867 F.Supp. 494, 495 (E.D.Tex.1994) (condemned prisoner was incompetent; lawyer who had represented him earlier could serve as next friend). Although Newman does not have the years-long relationship with Padilla that the lawyer in *Ford* had with her client, she has a sufficient relationship to overcome any suggestion that she is a mere intermeddler pursuing her own agenda.

Newman may act as next friend to Padilla here.

## III. THIS COURT'S JURISDICTION

The government argues as well that this action must be dismissed, or transferred to the District of South Carolina because the only proper respondent in a case such as this is Padilla's custodian; Padilla's only custodian is Marr, the commander of the brig in South Carolina where Padilla is housed; and she is not within this court's jurisdiction. The government has moved to dismiss the petition against respondents

other than Marr. For the reasons set forth below, that motion is granted with respect to the President and, *mea sponte,* as to Commander Marr, but is denied as to Secretary Rumsfeld.

The government's jurisdictional argument raises subsidiary issues: who is the proper respondent in a case such as this, whether this court has jurisdiction over that respondent, and whether this case should be transferred to South Carolina.

### A. *Who Is A Proper Respondent?*

■ As the government would have it, there is only one proper respondent to a habeas corpus petition, and that is the detainee's "immediate, not ultimate, custodian." (Mot. to Dismiss Am. Pet. at 11) The government points to language in 28 U.S.C. § 2242 directing that a petitioner "shall allege ... the name of the person who has custody over him," as well as language in 28 U.S.C. § 2243, requiring that a writ or order to show cause "shall be directed to the person having custody of the person detained," and providing that, "the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained," and argues, citing *Vasquez v. Reno,* 233 F.3d 688 (1st Cir.2000), that this language "indicates that there is only one proper respondent to a habeas petition," *id.* at 693.

■ It is certainly true that in the usual habeas corpus case brought by a federal prisoner, courts have held consistently that the proper respondent is the warden of the prison where the prisoner is held, not the Attorney General. *See, e.g., Sanders v. Bennett,* 148 F.2d 19, 20 (D.C.Cir.1945) ("But the Attorney General is not the person directly responsible for the operation of our federal penitentiaries. He is a supervising official rather than a jailer. For that reason, the proper person to be

served in the ordinary case is the warden of the penitentiary in which the prisoner is confined rather than an official in Washington, D.C., who supervises the warden."). The government cites numerous cases to the same effect. (*See* Mot. to Dismiss Am. Pet. at 15 n.6) Similarly, as a general rule, the proper respondent to a petition brought by a military prisoner who challenges a court martial conviction is the warden of the facility where he is held. The government cites, for example, *Monk v. Secretary of the Navy*, 793 F.2d 364 (D.C.Cir.1986), where the Court held "that for purposes of the federal habeas corpus statute, jurisdiction is proper only in the district in which the immediate, not the ultimate, custodian is located," *id.* at 369.

However, what makes the usual case usual is that the petitioner is serving a sentence, and the list of those other than the warden who are responsible for. his confinement includes only people who have played particular and discrete roles in confining him, notably the prosecuting attorney and the sentencing judge, and who no longer have a substantial and ongoing role in his continued confinement. The warden becomes the respondent of choice almost by default. As discussed below, this is not the usual case.

The hint of a more flexible approach in other than usual cases may be found even in authority cited by the government, involving prisoners who file § 2241 petitions challenging parole determinations. In *Billiteri v. United States Bd. of Parole*, 541 F.2d 938 (2d Cir.1976), although the Court held that a prisoner denied parole should sue the prison warden, not the Board of Parole, it added that a different conclusion might follow if the petitioner were challenging a detention that resulted from a parole violation:

> There are, to be sure, circumstances where a parole board may properly be considered a custodian for habeas cor-

pus purposes, e.g., after a prisoner has been released into its custody on parole, or arguably, when the Board itself has caused a parolee to be detained for violation of his parole.

*Id.* at 948 (citations omitted); *see also Guerra 'v. Meese*, 786 F.2d 414, 417 (D.C.Cir.1986) (warden held to be the proper respondent, but "[w]hen the appellees are paroled, if ever, the Parole Commission might then be considered their custodian, within the meaning of the habeas corpus statute").

Padilla argues that this case is analogous to the situation described in *Billiteri*, and cites *Bennett v. Soto*, 850 F.2d 161 (3d Cir.1988), where the Court held that the chair of the board of parole was responsible for revocation of petitioner's parole, and that he, rather than the warden, was the proper respondent for a petition brought under the analogous Virgin Island habeas statute, *id.* at 163; *see also McCoy v. United States Bd. of Parole*, 537 F.2d 962, 964–65 (8th Cir.1976) (Board of Parole, which issued warrant and lodged detainer, and not warden of detaining institution, is proper respondent). Other courts dealing with parole have gone even further, and held that a federal prisoner challenging the determination of his parole date may name the Parole Commission as a respondent. *See Dunn v. United States Parole Comm'n*, 818 F.2d 742, 744 (10th Cir.1987) (per curiam) (Parole Commission, not warden, "may be considered petitioner's 'custodian' for purposes of a challenge to a parole decision under 28 U.S.C. § 2241"); *see also Misasi v. United States Parole Comm'n*, 835 F.2d 754, 755 n. 1 (10th Cir.1987) (citing *Dunn* for the propriety of naming the Parole Commission).

In *Ahrens v. Clark*, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), the Supreme Court left open the question of whether the Attorney General may be named as a respondent when an alien peti-

tions under § 2241 to challenge his detention pending deportation. After *Ahrens,* our Court of Appeals has held out at least the possibility that the Attorney General might be a proper respondent in petitions brought by aliens detained in facilities of the Immigration and Naturalization Service ("INS"). In *Henderson v. INS,* 157 F.3d 106 (2d Cir.1998), the Court considered, but did not decide, whether the Attorney General could be a proper respondent in such cases. Two of the petitioners in *Henderson* named both the INS district director in Louisiana and the Attorney General as respondents. *Id.* at 122. Although the petitioners were not lodged in Louisiana, they were seeking release from detainers lodged by the INS district director in Louisiana. *Id.* The *Henderson* Court certified to the New York Court of Appeals the question of whether the INS district director in Louisiana was subject to New York long-arm jurisdiction, *id.* at 124, and although it did not rule on the propriety of naming the Attorney General, did discuss that issue at some length. The Court said that "additional factors related to the unique role that the Attorney General plays in immigration matters may be taken to suggest that she may be a proper respondent in alien habeas cases." *Id.* at 125–26. The Court added that the Attorney General "has the power to produce the petitioners, remains the ultimate decision-maker as to matters concerning the INS, and is commonly designated a respondent in these cases, even when personal jurisdiction over the immediate custodian clearly lies." *Id.* at 126 (citations omitted).

The *Henderson* Court took note of the dictum in *Billiteri,* discussed above, *see supra* p. 579, to the effect that a parole board might be the proper respondent if the board itself caused a parolee to be detained, and analogized the parolee to the alien in that the Attorney General by her own decision caused the alien to be detained. *Henderson,* 157 F.3d at 126 n. 22 (discussing *Billiteri,* 541 F.2d at 948).

The *Henderson* Court also acknowledged arguments against naming the Attorney General, including that the INS district director, rather than the Attorney General, exercised primary control over petitioners, and that *"Billiteri* appears to bar the designation of a higher authority (in that case, the parole board) as a custodian when a habeas petitioner is under the day-to-day control of another custodian (such as the prison warden)." *Id.* at 126–27. Although the *Henderson* Court acknowledged the government's concern that aliens could engage in forum shopping, it noted "that traditional venue doctrines are fully applicable in habeas suits" and these doctrines "if strictly applied, would do much to prevent forum shopping." *Id.* at 127. Although the Court's conclusion, in dictum, appears before this discussion, what the Court appears to have taken from these various considerations is the following: "Historically, the question of who is 'the custodian,' and therefore the appropriate respondent in a habeas suit, depends primarily on who has the power over the petitioner and, as we will discuss below, on the convenience of the parties and the court." *Id.* at 122.[7]

---

**7.** Both before and after *Henderson,* district courts in our Circuit have divided on whether the Attorney General can be named a respondent in such actions. *Compare, e.g., Lee v. Ashcroft,* 216 F.Supp.2d 51, 54 (E.D.N.Y. 2002) (Attorney General is proper respondent), *with, e.g., Carvajales–Cepeda v. Meissner,* 966 F.Supp. 207, 209 (S.D.N.Y.1997) (district director, not Attorney General, is proper respondent). In *Vasquez v. Reno,* 233

F.3d 688 (1st Cir.2000), the Court held that the Attorney General is not the proper respondent, although it left open the opposite possibility in "extraordinary cases" such as a case where a petitioner was held at an undisclosed location or one "in which the INS spirited an alien from one site to another in an attempt to manipulate jurisdiction." *Id.* at 696. Without much discussion, the Third Circuit held in

Other cases, some that concededly do not involve incarcerated prisoners, but others that do, also suggest that the issue of who is the proper respondent is not always subject to a formulaic answer, and may turn on the facts before the court. Thus, in a case involving inactive reservists, the government contested the petitioners' attempt to name the Secretaries of the Army and Air Force, arguing that only the "immediate custodian" was the proper respondent. *Eisel v. Sec'y of the Army*, 477 F.2d 1251, 1254 (D.C.Cir.1973). The Court declined to permit the Secretary of the Army or the Air Force to be named as a respondent, and emphasized the difference between the inactive reservist situation and the case of an incarcerated prisoner, *id.* at 1262, but dealt as follows with the government's "immediate custodian" argument:

> [W]hile the statute does provide that the action shall be against the "person having custody of the person detained," it does not define "custody" or specify who the person having "custody" will be. Nowhere does the statute speak of an "immediate custodian" or intimate that an action must necessarily be instituted in the location of such an "immediate custodian," even if it were possible to grant substance to the vague concept of "immediate custodianship."

*Id.* at 1258 (footnotes omitted). Moreover, in other armed forces cases, courts have permitted the Secretaries of the Air Force and the Navy to be named as respondents. *See Lantz v. Seamans*, 504 F.2d 423 (2d Cir.1974) (per curiam) (upholding jurisdiction of New York court over Secretary of the Air Force in case of petitioning reservist); *Carney v. Sec'y of Def.*, 462 F.2d 606 (1st Cir.1972) (Secretary of the Navy was proper respondent to petition brought by Navy serviceman).

Finally, in *Demjanjuk v. Meese*, 784 F.2d 1114 (D.C.Cir.1986) (Bork, J., in chambers), Judge Bork dealt with a petitioner seeking to avoid extradition who was being held at an undisclosed location. Judge Bork concluded that, "in these very limited and special circumstances" the Attorney General would be treated as the custodian and jurisdiction would lie in the D.C. Circuit alone. *Id.* at 1116.

Of the particular facts present here, the one that seems to me to bear most directly on the issue of who is a proper respondent is the personal involvement of the Cabinet-level official named as a respondent in the matter at hand. It was Secretary Rumsfeld who was charged by the President in the June 9 Order with detaining Padilla; it was plainly Secretary Rumsfeld who, in following that order, sent Defense Department personnel into this District to take custody of Padilla; it could only have been Secretary Rumsfeld, or his designee, who determined that Padilla would be sent to the brig in South Carolina, as opposed to a brig or stockade elsewhere; and, based on his own statements quoted above, *see supra* pp. 573–74, it would appear to be Secretary Rumsfeld who decides when and whether all that can be learned from Padilla has been learned, and, at least in part, when and whether the danger he allegedly poses has passed. This level of personal involvement by a Cabinet-level officer in the matter at hand is, so far as I can tell, unprecedented. Certainly, neither side, and no amicus, has cited a case even remotely similar in this respect. How "limited," *Demjanjuk*, 784 F.2d at 1116, these circumstances may be—that is, in how many other cases, if any, the Secretary of Defense may have such personal involvement—I know not. However, when viewed in comparison to past cases, the

*Yi v. Maugans,* 24 F.3d 500 (3d Cir.1994), that the warden and not the INS district director

is the custodian for habeas purposes in INS cases. *Id.* at 507.

circumstances present here seem at least "very special." *Id.* On these facts, the Secretary of Defense is the proper respondent.

As noted, Padilla has also sued the President. However, there are at least two reasons why the President should be dismissed as a party: first, Padilla does not seem to be seeking relief from the President; further, based on the authority cited below, the question of whether the President can be sued in this case raises issues this court should avoid if at all possible, and it is certainly possible to avoid them here.

Although it was the President who found that Padilla is an enemy combatant, and who signed the June 9 Order directing the Secretary of Defense to take custody of him, a common-sense assessment suggests that it is now the Secretary of Defense who decides what happens to Padilla. Based on where Padilla is housed—in a naval brig in South Carolina—and Secretary Rumsfeld's own statements as to the need to find out what Padilla knows and to detain him because of the danger he presents to national security, it is obviously Defense Department personnel rather than White House personnel who are interrogating Padilla, evaluating the worth of any information he provides, and deciding what danger, if any, he may continue to pose. Thus, although the June 9 Order directs the Secretary of Defense to take custody of Padilla, I do not interpret it to mean that the Secretary must hold Padilla until the President directs otherwise. Nor would I conclude that if the Secretary were lawfully directed by a court to release Padilla, he would refuse to do so on the basis of the June 9 Order. It does not appear that the President has an ongoing involvement in Padilla's custody, and therefore Padilla does not appear to be seeking any relief from the President. Therefore, on these facts, even assuming

that this court can direct the President to act, of which more in a moment, the President is not a proper party.

Moreover, the government has cited persuasive authority to the effect that this court has no power to direct the President to perform an official act. (Mot. to Dismiss Am. Pet. at 14) The relevant considerations are set forth in *Franklin v. Massachusetts,* 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), quoted below, where the plurality reversed a district court injunction directing the President to recalculate the number of representatives of the State of Massachusetts, and reasoned as follows:

> While injunctive relief against executive officials like the Secretary of Commerce is within the courts' power, *see Youngstown Sheet & Tube Co. v. Sawyer, supra,* the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows. We have left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely "ministerial" duty, *Mississippi v. Johnson,* 4 Wall. 475, 498–499, 18 L.Ed. 437 (1866), and we have held that the President may be subject to a subpoena to provide information relevant to an ongoing criminal prosecution, *United States v. Nixon,* 418 U.S. 683, 694, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), but in general "this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson, supra,* 4 Wall. at 501. At the threshold, the District Court should have evaluated whether injunctive relief against the President was available, and, if not, whether appellees' injuries were nonetheless redressable.

For purposes of establishing standing, however, we need not decide whether injunctive relief against the President was appropriate because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone. *Id.* at 802–03, 112 S.Ct. 2767. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). In this case, as in *Franklin,* the necessary relief, if any, may be secured by an order to the Secretary alone, and the President can be dismissed as a party. There is no need to decide whether, were the facts otherwise, the President too could be named a respondent in a habeas corpus case such as this.

Although petitioner has named Commander Marr as a respondent, he and amici New York and National Criminal Defense Lawyers argue that she is not a necessary respondent in this case because she takes her orders from Secretary Rumsfeld and, indirectly, from President Bush, and cannot produce Padilla in violation of those orders without subjecting herself to a court martial. (Petitioners' Reply to Mot. to Dismiss Am. Pet. at 22–23) The government responds by pointing out that, "[n]o warden of any penal facility possesses independent power to release a prisoner, yet wardens are universally designated as the proper custodians in prisoner habeas cases." (Respondents' Reply in Supp. of Mot. to Dismiss Am. Pet. at 18) This debate now seems beside the point. I have already determined that Secretary Rumsfeld is a proper respondent, and there is nothing to indicate that he cannot or would not direct Commander Marr to obey any lawful order of this court, if

necessary. Accordingly, the petition will be dismissed also as to Commander Marr.

### B. *Territorial Jurisdiction*

The habeas corpus statute, 28 U.S.C. § 2241(a) (2000), permits the writ to be granted by district courts "within their respective jurisdictions." The government argues that this phrase operates to limit the jurisdiction of the court to grant the writ, beyond any limits otherwise imposed by the Federal Rules of Civil Procedure, and requires, at a minimum, that the respondent be physically present within this District in order for the court to grant relief. (Mot. to Dismiss at 17; Respondents' Reply in Supp. of Mot. to Dismiss Am. Pet. at 22) However, for the reasons set forth below, the government's reading of the statute is inconsistent with governing authority, and this court may grant relief under the statute if relief is otherwise warranted.

The subject phrase—"within their respective jurisdictions"—was read initially by the Supreme Court in *Ahrens v. Clark,* 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948), to require that a petitioner be physically present within the geographic boundaries of the district before a petition could be heard. However, the Court did away with that requirement in *Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), where it held that a prisoner confined in an Alabama state prison following a felony conviction could seek habeas corpus relief in Kentucky to attack an indictment pending there, reasoning that in enforcing a Kentucky detainer, the Alabama warden was acting simply as the agent of the state of Kentucky, which was the real custodian. The Court said:

Read literally, the language of § 2241(a) requires nothing more than that the court issuing the writ have jurisdiction

over the custodian. So long as the custodian can be reached by service of process, the court can issue a writ "within its jurisdiction" requiring that the prisoner be brought before the court for a hearing on his claim, or requiring that he be released outright from custody, even if the prisoner himself is confined outside the court's territorial jurisdiction.

*Id.* at 495, 93 S.Ct. 1123. In *Henderson v. INS*, 157 F.3d 106 (2d Cir.1998), the Second Circuit relied on *Braden* for the proposition that a New York district court would have jurisdiction to hear the § 2241 petitions of detained aliens so long as it had jurisdiction over the petitioners' custodian through New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1) (McKinney 1990): "A court has personal jurisdiction in a habeas case 'so long as the custodian can be reached by service of process.'" *Id.* at 122 (quoting *Braden*, 410 U.S. at 495, 93 S.Ct. 1123). The *Henderson* Court then certified to the New York Court of Appeals the question of whether New York's long-arm statute reached the INS district director in Louisiana, where the *Henderson* petitioners were detained. That Court declined to answer the question, and the parties then resolved the cases amicably. *See Yesil v. Reno*, 175 F.3d 287 (2d Cir.1999) (per curiam). The Second Circuit has not considered the issue since.

However, before *Henderson*, in *U.S. ex rel. Sero v. Preiser*, 506 F.2d 1115 (2d Cir.1974), the Second Circuit had occasion to consider the reach of a district court's jurisdiction under § 2241(a) when it construed § 2241(d), which directs that in a state having more than one district, a habeas petition from a prisoner in state custody pursuant to a state conviction be filed in either the district of conviction or the district of confinement, with the district courts involved then having discretion to transfer the case as they deem necessary.

The Court noted that both the enactment of § 2241(d) in 1966, and the Supreme Court's decision in *Braden*, were intended to undo the damage caused by *Ahrens*, and said, based on both *Braden* and the statute itself, that it made sense to read § 2241(d) as a provision fixing venue rather than jurisdiction. The Court reasoned in part as follows: "If the original jurisdictional grant in § 2241(a) was to be construed as coextensive with the scope of service of process, see Fed.R.Civ.P. 4(f), then a jurisdictional reading of § 2241(d) would render that subsection merely repetitious." *Id.* The Court's view that § 2241(a) was "coextensive with the scope of service of process" followed, at least in part, from its reading of *Braden*.

Both before and after *Henderson*, several district courts in this Circuit have held that if a respondent can be reached through the forum state's long-arm statute, the court has jurisdiction to hear the petition, *see, e.g., Barton v. Ashcroft*, 152 F.Supp.2d 235, 239 (D.Conn.2001); *Perez v. Reno*, No. 97 Civ. 6712, 2000 WL 686369, at *3 (S.D.N.Y. May 25, 2000); as has a district court in the Sixth Circuit, *see Roman v. Ashcroft*, 162 F.Supp.2d 755, 758 (N.D.Ohio 2001).

The government disagrees with those cases, and argues that habeas corpus jurisdiction is different. It notes that 28 U.S.C. § 1391(e), which provides for nationwide service of process on federal officials, does not apply in habeas corpus proceedings, and argues that *Braden* did nothing to change what the government perceives as the requirement that the custodian in habeas cases involving incarcerated prisoners be located within the district where the petition is filed. Padilla does not assert that § 1391(e) does so apply, but simply that a district court can exercise long-arm jurisdiction if the facts otherwise so warrant, even without resort

to § 1391(e). *See Perez*, 2000 WL 686369, at *3 (acknowledging that 28 U.S.C. § 1391(e) does not apply, but exercising jurisdiction over out-of-state respondent through New York's long-arm statute).

It is not only *Henderson*, which I recognize assumed more than held that New York's long-arm statute can provide the basis for personal jurisdiction over habeas corpus respondents, and the above-cited cases, which are not binding authority, that cut against the government's reading of *Braden* and therefore against its position here. The Supreme Court cases that antedated *Braden* provide a context for that case that undercuts the government's position.

One such case, relied on by the government, is *Schlanger v. Seamans*, 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), where the petitioner, a serviceman on "permissive temporary duty" attending school in Arizona, sued in Arizona alleging that his enlistment contract had been breached. He named as respondents the Secretary of the Air Force, the commander of Moody Air Force Base, in Georgia, to which he had been assigned, and the commander of the ROTC program at the school he was attending. The Court framed the issue as follows: "The question in the instant case is whether any custodian, or one in the chain of command, as well as the person detained, must be in the territorial jurisdiction of the court." *Id.* at 489, 91 S.Ct. 995. The Court concluded that it was the commander of the Georgia base who was the proper custodian, and therefore, "the District Court in Arizona has no custodian against whom its writ can run .... [T]he absence of the custodian is fatal to the jurisdiction of the Arizona District Court." *Id.* at 491, 91 S.Ct. 995.

However, a year later, in *Strait v. Laird*, 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972), the Court considered the petition of an inactive Army reservist whose contact with the Army had occurred in California but whose "nominal commanding officer" was at a record-keeping center in Indiana. *Id.* at 342, 92 S.Ct. 1693. The Court recognized its prior holding "in *Schlanger* that the presence of the 'custodian' within the territorial jurisdiction of the District Court was a sine qua non," *id.* at 343, 92 S.Ct. 1693, but added: "The jurisdictional defect in *Schlanger*, however, was not merely the physical absence of the Commander of Moody AFB from the District of Arizona, but the total lack of formal contacts between Schlanger and the military in that district," *id.* at 344, 92 S.Ct. 1693. Referring to Strait's commanding officer in Indiana, the Court said:

> Strait's situation is far different. His nominal custodian, unlike Schlanger's, has enlisted the aid and directed the activities of armed forces personnel in California in his dealings with Strait. Indeed, in the course of Strait's enlistment, virtually every face-to-face contact between him and the military has taken place in California. In the face of this record, to say that Strait's custodian is amenable to process only in Indiana—or wherever the Army chooses to locate its recordkeeping center—would be to exalt fiction over reality.

*Id.* (citation omitted). The Court concluded that "Strait's commanding officer is 'present' in California through the officers in the hierarchy of command who processed this serviceman's application for discharge." *Id.* at 345, 92 S.Ct. 1693. Further, the Court cited and explicitly endorsed in *Strait, id.* at 344–45, 92 S.Ct. 1693, the Second Circuit's decision in *Arlen v. Laird*, 451 F.2d 684 (2d Cir.1971), where that Court permitted a petition to be filed in New York by an inactive reservist residing there, even though his nominal commanding officer was located in Indiana. The Second Circuit rejected what it called the "limited interpretation of *Schlanger*,"

*id.* at 686, and concluded that *Schlanger* did not preclude a district court "with jurisdiction over the territory in which an unattached reservist is in custody and in which he reside and works, from entertaining his petition for habeas corpus solely because his nominal 'commanding officer' is not physically present in the jurisdiction," *id.* Thus, in *Strait,* instead of focusing on whether the custodian was physically present within the district, the Court looked at the contacts the custodian had with the district.

Further, in *Strait,* the Court relegated to a footnote the issue of whether such "presence" could suffice for personal jurisdiction, calling that conclusion "well settled." *Id.* at 346 n. 2, 92 S.Ct. 1693.

The government would read narrowly the Court's reference in *Braden* to service of process, when it said that, "[s]o long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction'," *Braden,* 410 U.S. at 495, 93 S.Ct. 1123 (quoting 28 U.S.C. § 2241(a)), by referring to the concluding lines of the case:

> Since the petitioner's absence from the Western District of Kentucky did not deprive the court of jurisdiction, and since the respondent was properly served in that district, see *Strait v. Laird,* 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972); *Schlanger v. Seamans,* 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), the court below erred in ordering the dismissal of the petition on jurisdictional grounds.

*Id.* at 500, 93 S.Ct. 1123. The government reads the phrase, "the respondent was

properly served in that district" to mean that *Braden*'s reference to reaching a custodian through service of process did not "contemplate service outside a district court's territorial jurisdiction." (Respondents' Reply in Supp. of Mot. to Dismiss Am. Pet. at 22) However, the *Braden* Court cited both *Schlanger* and *Strait* as authority to support the statement that "respondent was properly served in that district." Obviously, that respondent in *Braden* was properly served within the district where that case was filed was *sufficient* to confer personal jurisdiction, but *Strait,* which the *Braden* Court itself also cites, shows that it was not also *necessary.*

The government cites language in several cases in the First, Sixth, Eighth, Ninth and District of Columbia Circuits, some of which have already been discussed above, to the effect that a respondent in a habeas corpus case must be physically present within the district where the petition is brought.[8] I have examined those cases, which involve either the usual prisoner habeas scenario treated above, or otherwise fit comfortably within the pattern of the other cases discussed above. I do not believe any of them read on the facts present here, and it would lengthen this already lengthy opinion unduly to distinguish each of them in detail. For the above reasons, as I read *Braden,* there is nothing in 28 U.S.C. § 2241(a) to prevent this court from exercising jurisdiction over Padilla's petition, particularly if New York's long-arm statute authorizes such exercise. For the same reasons, I believe this reading is confirmed by *Henderson.*

---

**8.** Those cases are: *Malone v. Calderon,* 165 F.3d 1234, 1237 (9th Cir.1999); *Yi v. Maugans,* 24 F.3d 500, 507 (3d Cir.1994); *Dunne v. Henman,* 875 F.2d 244, 249 (9th Cir.1989); *Monk,* 793 F.2d at 369; *Guerra,* 786 F.2d at 417; *Wright v. United States Bd. of Parole,* 557 F.2d 74, 77 (6th Cir.1977); *Gravink v. United States,* 549 F.2d 1152, 1154 (8th Cir.1977);

*United States v. Clinkenbeard,* 542 F.2d 59, 60 (8th Cir.1976); *United States v. DiRusso,* 535 F.2d 673, 676 (1st Cir.1976); *Lee v. United States,* 501 F.2d 494, 501 (8th Cir.1974); *Sholars v. Matter,* 491 F.2d 279, 281 (9th Cir. 1974); *United States v. Sparrow,* 463 F.2d 1215, 1216 (7th Cir.1972).

To the extent any of the out-of-circuit cases the government cites may bear on this case, such authority is to be treated as persuasive but not binding, *see, e.g., Pireno v. N.Y. State Chiropractic Ass'n.*, 650 F.2d 387, 395 n. 13 (2d Cir.1981), and, for the above reasons, I respectfully differ from the reasoning in any such cases.

## C. *Personal Jurisdiction*

■■■ The question of whether New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1) (McKinney 1990), reaches Secretary Rumsfeld is not complex. That section permits a court in New York to exercise personal jurisdiction, "[a]s to a cause of action arising from any of the acts enumerated" therein, "over any non-domiciliary ... who in person or through an agent ... transacts any business within the state." *Id.* The statute's "reference to 'business' is read broadly as 'purposeful activities,' without any limitation to commercial transactions." *Perez*, 2000 WL 686369, at *3 (citing *Madden v. International Ass'n of Heat and Frost Insulators and Asbestos Workers*, 889 F.Supp. 707, 710 (S.D.N.Y.1995)). Section 302(a)(1) is a "single act statute": only one transaction is needed to confer jurisdiction, so long as the defendant's activities were purposeful and there is a substantial relationship between those activities and the claim in suit. *See Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 198–99, 522 N.E.2d 40 (1988). Here, Secretary Rumsfeld was directed by the President on June 9 to take custody of Padilla, and, as noted, the government has acknowledged that agents of the Department of Defense came into this district that day and did so. (Tr. of 6/11/02 at 7; *see also* Tr. of 7/31/02 at 17) That conduct, through agents, is sufficient to confer jurisdiction over Secretary Rumsfeld. There is no denial of due process in finding personal jurisdiction under these circumstances.

## D. *Transfer to South Carolina*

■■ The government has moved in the alternative to transfer this case to the District of South Carolina. The principal arguments for transfer relate to issues already covered—principally, who is the proper respondent and whether this court has jurisdiction over that respondent and otherwise can hear this case. Those issues have been resolved in a way that favors keeping the case here.

Further, Padilla's lawyers are here, and Newman was here working to secure his release before he was taken to South Carolina. As a result of his having sent his agents into this district to take custody of Padilla, the Secretary can be reached through process issued by this court. Thus, he too is, in a legal if not quite a physical sense, here. Commander Marr is not here, but for reasons already explained there is no need that she be present in the jurisdiction where the action is pending. For current purposes, the Secretary will suffice. It may be, as set forth below, that it will be necessary for counsel to confer briefly with Padilla, which would entail a trip to South Carolina. However, as between taking a brief trip to South Carolina to confer with their client, and litigating the case in South Carolina, the convenience of counsel is served by keeping the case here. Insofar as the above cases suggest that considerations of convenience and practicality are relevant, *see Henderson*, 157 F.3d at 122, those considerations are served by keeping the case here. The government's motion to transfer the case to South Carolina therefore is denied.

## IV. THE LAWFULNESS OF PADILLA'S DETENTION

■■ The basic question dividing the parties is whether Padilla is lawfully detained. Like the question of whether this court has jurisdiction, that basic question

unfolds into subsidiary questions: Does the President have the authority to designate as an enemy combatant an American citizen captured on American soil, and, through the Secretary of Defense, to detain him for the duration of armed conflict with al Qaeda? If so, can the President exercise that authority without violating 18 U.S.C. § 4001(a),[9] which bars the detention of American citizens "except pursuant to an Act of Congress"? 18 U.S.C. § 4001(a) (2000). If so, by whatever standard this court must apply—itself a separate issue—is the evidence adduced by the government sufficient to justify the detention of Padilla? As was true of the questions underlying the issue of jurisdiction, each of those questions subsumes its own set of questions.

For the reasons set forth below, the answer to the first two of those questions is yes; a definitive answer to the third of those questions must await a further submission from Padilla, should he choose to make one, although the court will examine only whether there was some evidence to support the President's finding, and whether that evidence has been mooted by events subsequent to Padilla's detention.

A. *The President's Authority To Order That Padilla Be Detained As An Enemy Combatant*

Neither Padilla nor any of the amici denies directly the authority of the President to order the seizure and detention of enemy combatants in a time of war. Rather, they seek to distinguish this case from cases in which the President may make such an order on the grounds that this is not a time of war, and therefore the President may not use his powers as Commander in Chief or apply the laws of war to Padilla, and that Padilla in any event must be treated differently because he is an American citizen captured on American soil where the courts are functioning.

■ The claim by petitioner and the amici that this is not a time of war has two prongs: First, because Congress did not declare war on Afghanistan, the only nation state against which United States forces have taken direct action, the measures sanctioned during declared wars, principally in *Ex Parte Quirin*, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942), discussed below, are not available here. Second, because the current conflict is with al Qaeda, which is essentially an international criminal organization that lacks clear corporeal definition, the conflict can have no clear end, and thus the detention of enemy combatants is potentially indefinite and therefore unconstitutional. For the reasons discussed below, neither prong of the argument withstands scrutiny.

■ The first prong of the argument—that we are not in a war and that only Congress can declare war—does not

---

**9.** Padilla argues also that his detention by the military violates the Posse Comitatus Act, codified at 18 U.S.C. § 1385. That statute makes it unlawful to use. the military "as a posse comitatus or otherwise to execute the laws." First, it is questionable whether that statute is enforceable in a habeas corpus proceeding to secure release from custody. *Cf. Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir.1994) (no private right of action to enforce Posse Comitatus Act). Moreover, the statute bars use of the military in civilian law enforcement. *See United States v. Mullin*, 178 F.3d 334, 342 (5th Cir. 1999) ("The [Posse Comitatus] Act is designed to restrict military involvement in civilian law enforcement."). Padilla is not being detained by the military in order to execute a civilian law or for violating a civilian law, notwithstanding that his alleged conduct may in fact violate one or more such laws. He is being detained in order to interrogate him about the unlawful organization with which he is said to be affiliated and with which the military is in active combat, and to prevent him from becoming reaffiliated with that organization. Therefore, his detention by the military does not violate the Posse Comitatus Act.

engage the real issue in this case, which concerns what powers the President may exercise in the present circumstances. Even assuming that a court can pronounce when a "war" exists, in the sense in which that word is used in the Constitution, *cf. Bas v. Tingy,* 4 U.S. (4 Dall.) 37, 42, 1 L.Ed. 731 (1800) (determining whether France, with which the United States had engaged in an undeclared naval war, was an "enemy" within the meaning of a prize statute, but noting that whether there was a war in a constitutional sense was irrelevant: "Besides, it may be asked, why should the rate of salvage be different in such a war as the present, from the salvage in a war more solemn [*i.e.,* declared] or general?"), a formal declaration of war is not necessary in order for the executive to exercise its constitutional authority to prosecute an armed conflict—particularly when, as on September 11, the United States is attacked. In *The Prize Cases,* 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1862), the Supreme Court rejected a challenge to the President's authority to impose a blockade on the secessionist states—an act of war—when there had been no declaration of war. The Court acknowledged that the President "has no power to initiate or declare a war." *Id.* at 668, 2 Black 635. However, the Court recognized also that "war may exist without a declaration on either side," *id.,* and that when the acts of another country impose a war on the United States, the President "does not initiate that war, but is bound to accept the challenge without waiting for any special legislative authority," *id.* The Court made it plain that what military measures were necessary was a political and not a judicial decision: "Whether the President in fulfilling his duties, as Commander-in-chief, in suppressing an insurrection, has met with such armed hostile resistance, and a civil war of such alarming proportions as will compel him to accord to them the character of belligerents, is a question to be decided by *him,* and this Court must be governed by the decisions and acts of the political department of the Government to which this power was entrusted." *Id.* at 670, 2 Black 635. It was the President, and not the Court, who:

> must determine what degree of force the crisis demands. The proclamation of blockade is itself official and conclusive evidence to the Court that a state of war existed which demanded and authorized a recourse to such a measure, under the circumstances peculiar to the case.

*Id.* Here, I agree completely with Judge Silberman who, after examining and quoting from *The Prize Cases,* wrote as follows:

> I read the *Prize Cases* to stand for the proposition that the President has independent authority to repel aggressive acts by third parties even without specific congressional authorization, and courts may not review the level of force selected.

*Campbell v. Clinton,* 203 F.3d 19, 27 (D.C.Cir.2000) (Silberman, J., concurring); *see also Johnson v. Eisentrager,* 339 U.S. 763, 789, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) ("Certainly it is not the function of the Judiciary to entertain private litigation ... which challenges the legality, wisdom, or the propriety of the Commander–in–Chief in sending our armed forces abroad or to any particular region."); *Freeborn v. The Protector,* 79 U.S. (12 Wall.) 700, 702, 20 L.Ed. 463 (1871) (treating executive proclamations as conclusive evidence of when the Civil War began and ended); *Martin v. Mott,* 25 U.S. (12 Wheat.) 19, 30, 6 L.Ed. 537 (1827) (Story, J.) ("We are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons.").

█ The conclusion that the President may exercise his powers as Commander in

Chief without a declaration of war is borne out not only by legal precedent, but also by even the briefest contemplation of our history. When one considers the sheer number of military campaigns undertaken during this country's history, declarations of war are the exception rather than the rule, beginning with the undeclared but Congressionally authorized naval war against France in the 1790's referred to in *Bas v. Tingy,* cited above. Taking into account only the modern era, the last declared war was World War II. Since then, this country has fought the Korean War, the Viet Nam War, the Persian Gulf War, and the Kosovo bombing campaign, as well as other military engagements in Lebanon, Haiti, Grenada and Somalia, to cite a random and by no means exhaustive list, with no appellate authority holding that a declaration of war was necessary. When confronted with challenges to the Viet Nam War, several appellate courts held specifically that no declaration of war was necessary. *See, e.g., Mitchell v. Laird,* 488 F.2d 611, 613–14 (D.C.Cir.1973); *Com. of Massachusetts v. Laird,* 451 F.2d 26, 31–32 (1st Cir.1971); *Orlando v. Laird,* 443 F.2d 1039, 1043 (2d Cir.1971).

Further, even if Congressional authorization were deemed necessary, the Joint Resolution, passed by both houses of Congress, authorizes the President to use necessary and appropriate force in order, among other things, "to prevent any future acts of international terrorism against the United States," and thereby engages the President's full powers as Commander in Chief. Authorization for Use of Military Force § 2(a).

The laws of war themselves, which the President has invoked as to Padilla, apply regardless of whether or not a war has

been declared. What is sometimes referred to as the Third Geneva Convention—Geneva Convention Relative to the Treatment of Prisoners of War ("GPW"), Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135, to which the United States is a party and which therefore under the Supremacy Clause has the force of domestic law,[10] states that it applies, "to all cases of declared war or any other state of armed conflict." GPW, art. 2.

The question of when the conflict with al Qaeda may end is one that need not be addressed. So long as American troops remain on the ground in Afghanistan and Pakistan in combat with and pursuit of al Qaeda fighters, there is no basis for contradicting the President's repeated assertions that the conflict has not ended. *See Ludecke v. Watkins,* 335 U.S. 160, 167–69, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948) (deferring to the President's position that a state of war continued to exist despite Germany's surrender to the Allies). At some point in the future, when operations against al Qaeda fighters end, or the operational capacity of al Qaeda is effectively destroyed, there may be occasion to debate the legality of continuing to hold prisoners based on their connection to al Qaeda, assuming such prisoners continue to be held at that time. *See id.* at 169, 68 S.Ct. 1429 ("Whether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled.").

 To the extent petitioner and the amici are suggesting that because the period of Padilla's detention is, at this moment, indefinite, it is therefore perpetual, and

---

**10.** *See* U.S. Const. Art. VI, § 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land . . . .").

therefore illegal, the argument is illogical. Moreover, insofar as the argument assumes that indefinite confinement of one not convicted of a crime is *per se* unconstitutional, that assumption is simply wrong. In *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the Court upheld Kansas's Sexually Violent Predator Act, providing for civil commitment of those who, due to "mental abnormality" or "personality disorder" are likely to commit sexually predatory acts. Rejecting the argument that the statute imposed criminal sanctions in the guise of a civil remedy, the Court noted that "commitment under the Act does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." *Id.* at 361–62, 117 S.Ct. 2072. The Court found that the statute was not retributive "because it does not affix culpability for prior criminal conduct," *id.* at 362, 117 S.Ct. 2072, and that it was not intended as a deterrent because the targets of the statute were "unlikely to be deterred by the threat of confinement," *id.* at 362–63, 117 S.Ct. 2072. *See also United States v. Salerno,* 481 U.S. 739, 748, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest. For example, in times of war and insurrection, when society's interest is at its peak, the Government may detain individuals whom the Government believes to be dangerous."); *Moyer v. Peabody,* 212 U.S. 78, 84, 29 S.Ct. 235, 53 L.Ed. 410 (1909) (upholding the detention of a union president without charge during an insurrection, reasoning: "Such arrests are not necessarily for punishment but are by way of precaution, to prevent the exercise of hostile power"). To be sure, the standard of proof in some of those cases may well have been higher than the standard ultimately will be found to be in this case, but the point is that there is no *per se* ban.

The Court recently raised constitutional doubts as to the permissible length of preventive detention when it considered a case involving aliens awaiting deportation, and therefore read the governing statute to limit such detention to the time reasonably necessary to secure the alien's removal, with six months presumed as a reasonable limit. *Zadvydas v. Davis,* 533 U.S. 678, 691–97, 701, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). However, even while doing so, the Court was careful to point out that the case before it did not involve "terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security." *Id.* at 696, 121 S.Ct. 2491.

Further, the notion that a court must be able now to define conditions under which the current conflict will be declared to be over, and presumably open its doors to parties who may wish to litigate before the fact what those conditions might be, defies the basic concept of Article III jurisdiction. Federal courts, it will be recalled, are not permitted to deal with any but actual "cases" and "controversies," U.S. Const., art. III, § 2, as opposed to those disputes that live only on the agendas of interested parties. When and if the time comes that Padilla can credibly claim that he has been detained too long, whether due to the sheer duration of his confinement or the diminution or outright cessation of hostilities, the issue of how and whether such a claim can be adjudicated will have to be faced. I do not understand Padilla to be making that claim now, and therefore see no need to face that issue now.

�▪ Padilla and the amici challenge the President's authority to declare him an enemy combatant, and to apply to him the laws of war, citing his American citizenship and his capture on American soil at a time when the courts were functioning. Before examining directly the issue of the President's authority, it is necessary to examine what the designation "enemy combatant" means in this case. The laws of war draw a fundamental distinction between lawful and unlawful combatants. Lawful combatants may be held as prisoners of war, but are immune from criminal prosecution by their captors for belligerent acts that do not constitute war crimes. *See United States v. Lindh*, 212 F.Supp.2d 541, 553 (E.D.Va.2002) (citing numerous authorities); GPW, art. 87.

▪ Four criteria generally determine the conditions an armed force and its members must meet in order to be considered lawful combatants:

(1) To be commanded by a person responsible for his subordinates; (2) To have a fixed distinctive emblem recognizable at a distance; (3) To carry arms openly; and (4) To conduct their operations in accordance with the laws and customs of War.

Convention Respecting the Laws and Customs of War on Land, with Annex of Regulations, Oct. 18, 1907, Annex art. 1, 36 Stat. 2277, T.S. No. 539 (Jan. 26, 1910) (the "Hague Convention" and the "Hague Regulations"). Those who do not meet those criteria, including saboteurs and guerrillas, may not claim prisoner of war status. *See Quirin*, 317 U.S. at 31, 63 S.Ct. 1 (citing authorities for the proposition that unlawful combatants are "offenders against the law of war" and may be tried by military tribunals).

The Third Geneva Convention, referred to above, reaffirmed the distinction between lawful and unlawful combatants. Article 4 of that treaty uses the same standards as the Hague Regulations for distinguishing who must be treated as a prisoner of war from who enjoys no such protection. *See* GPW, art. 4(2). Although in the past unlawful combatants were often summarily executed, such Draconian measures have not prevailed in modern times in what some still refer to without embarrassment as the civilized world. *See Manual of Military Law* 242 (British War Office 1914) ("No law authorizes [officers] to have [any disarmed enemy] shot without trial; and international law forbids summary execution absolutely.").[11] Rather, as recognized in *Quirin*, unlawful combatants generally have been tried by military commissions. *Quirin*, 317 U.S. at 35, 63 S.Ct. 1. They are not entitled to prisoner of war status, either as a matter of logic or as a matter of law under the Third Geneva Convention. It is not that the Third Geneva Convention authorizes particular treatment for or confinement of unlawful com-

---

**11.** However, when they did prevail, in the practices of German troops during World War II, who often shot partisans summarily, certain of those tried after that war were found to have a valid defense based on the unlawful status of their victims. In one trial of Axis officials accused of murdering captured partisans in the Balkans, the Court wrote: "The [partisan] bands ... with which we are dealing in this case were not shown by satisfactory evidence to have met the requirements [for lawful combatant status]. This means, of course, that captured members of these unlawful groups were not entitled to be treated as prisoners of war. No crime can be properly charged against the defendants for the killing of such captured members of the resistance forces, they being franc-tireurs [another term for unlawful combatants, dating from the Franco–Prussian War, when irregular French fighters captured by Prussian soldiers were summarily executed]." *The Hostages Trial: Trial of Wilhelm List and Others* (Case No. 47), 8 L. Rpts. of Trials of War Criminals 34, 57 (U.N. War Crimes Comm'n 1948).

batants; it is simply that that convention does not protect them.

 Although unlawful combatants, unlike prisoners of war, may be tried and punished by military tribunals, there is no basis to impose a requirement that they be punished. Rather, their detention for the duration of hostilities is supportable—again, logically and legally—on the same ground that the detention of prisoners of war is supportable: to prevent them from rejoining the enemy. Under the Third Geneva Convention, the recognized purpose of confinement during an ongoing conflict is "to prevent military personnel from taking up arms once again against the captor state." ICRC, *Commentary on the Geneva Conventions of 12 August 1949, Geneva Convention III Relative to the Treatment of Prisoners of War* 547 (1960). Thus, Article 118 of the Third Geneva Convention provides, as to release of prisoners, only that "[p]risoners of war shall be released and repatriated without delay after the cessation of active hostilities." GPW, art. 118.

As noted, in the June 9 Order, the President designated Padilla an "enemy combatant" based on his alleged association with al Qaeda and on an alleged plan undertaken as part of that association. *See supra* p. 572. The point of the protracted discussion immediately above is simply to support what should be an obvious conclusion: when the President designated Padilla an "enemy combatant," he necessarily meant that Padilla was an unlawful combatant, acting as an associate of a terrorist organization whose operations do not meet the four criteria necessary to confer lawful combatant status on its members and adherents. *See* Ruth Wedgwood, *Al Qaeda, Terrorism, and Military Commissions,* 96 Am. J. Int'l L. 328, 335 (2002) ("Al Qaeda has failed to fulfill four prerequisites of lawful belligerency."); *see also Quirin,* 317 U.S. at 31, 63 S.Ct. 1 (describing an unlaw-

ful combatant as, *inter alia,* one "who without uniform comes secretly through the lines for the purpose of waging war by destruction of life or property"). Indeed, even the Taliban militia, who appear at least to have acted in behalf of a government in Afghanistan, were found by Judge Ellis in *Lindh* not to qualify for lawful combatant status. *Lindh,* 212 F.Supp.2d at 557–58.

That brings us to the central issue presented in this case: whether the President has the authority to designate as an unlawful combatant an American citizen, captured on American soil, and to detain him without trial. Padilla and the amici argue that, regardless of what treatment is permitted under the Third Geneva Convention and otherwise for unlawful combatants, the Constitution forbids indefinite detention of a citizen captured on American soil so long as "the courts are open and their process unobstructed," *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 121, 18 L.Ed. 281 (1866). Padilla relies heavily on *Milligan,* a Civil War-era case in which Milligan was one of a group arrested in Indiana and tried before a military commission on a charge of conspiring against the United States by planning to seize weapons, free Confederate prisoners, and kidnap the governor of Indiana. Convicted and sentenced to death, he filed a habeas corpus petition challenging the jurisdiction of the military commission to try him. The Court set aside the conviction, declaring that the "[laws of war] can never be applied to citizens in states which have upheld the authority of the government, and where the courts are open and their process unobstructed." *Id.* The Court found that the military commission had unlawfully usurped the judicial function, *id.,* reasoning that although the President had the power to suspend the writ of habeas corpus during the Civil War, all other rights remained intact, even in wartime. The

Framers, the Court found, "limited the [power of] suspension to one great right [*i.e.*, the right to petition for habeas corpus], and left the rest to remain forever inviolable." *Id.* at 126, 4 Wall. 2.

*Milligan*, however, received a narrow reading in *Quirin*, a case on which the government, not surprisingly, places heavy reliance. Petitioners in *Quirin* were German saboteurs put ashore in June 1942, during World War II, in two groups, from submarines off Amagansett, a village on Long Island, New York, and off Ponte Vedra Beach, Florida. They landed wearing German uniforms, which they quickly buried, and changed into civilian dress.[12] They intended to sabotage war industries and facilities in the United States, but were arrested before their plans ripened into action. *See Quirin*, 317 U.S. at 21, 63 S.Ct. 1. One of the saboteurs, Haupt, claimed United States citizenship, which the government disputed; the Court found the issue immaterial. Rather, the Court found that Haupt's belligerent status distinguished him from Milligan, noting that "the [*Milligan* ] Court was at pains to point out that Milligan, a citizen twenty years resident in Indiana, who had never been a resident of any of the states of rebellion, was not an enemy belligerent either entitled to the status of a prisoner of war or subject to the penalties imposed upon unlawful belligerents." *Id.* at 45, 63 S.Ct. 1. The Court continued:

> We construe the Court's statement as to the inapplicability of the law of war to

Milligan's case as having particular reference to the facts before it. From them the Court concluded that Milligan, not being a part of or associated with the armed forces of the enemy, was a non-belligerent, not subject to the law of war save as—in circumstances found not there to be present and not involved here—martial law might be constitutionally established.

*Id.* Because the *Quirin* Court found that the German saboteurs were not only attempting to harm the United States during an armed conflict but doing so as persons associated with an enemy's armed forces, the Court concluded that the saboteurs, unlike Milligan, could be treated as unlawful combatants. Padilla, like the saboteurs, is alleged to be in active association with an enemy with whom the United States is at war.

Although the particular issue before the Court in *Quirin*—whether those petitioners could be tried by a military tribunal— is not precisely the same as the one now before this court—whether Padilla may be held without trial, the logic of *Quirin* bears strongly on this case. First, *Quirin* recognized the distinction between lawful and unlawful combatants, and the different treatment to which each is potentially subject:

> By universal agreement and practice the law of war draws a distinction between . . . lawful and unlawful combatants. Lawful combatants are subject to cap-

---

**12.** At first glance, it seems nearly perverse that the saboteurs, whose mission not only did not require uniforms but could be betrayed by them, would nonetheless land in uniforms and thereby impose on one of the most dangerous parts of the mission—the landing—when they were most vulnerable to detection, the time-consuming and complicated steps of having to change into civilian clothes and bury the uniforms. In fact, it was not perverse at all. Rather, it seems clear that those who organized the mission well understood the rules of war, and understood also that if the saboteurs were captured during the landing, when they were particularly vulnerable to detection, and were not wearing uniforms, they would have no hope of being classified as lawful combatants. The uniforms provided at least a measure of protection for the saboteurs against unlawful combatant status if they were captured during the landing. *See supra* pp. 592–93 and authority cited therein.

ture and detention as prisoners of war by opposing military forces. Unlawful combatants are likewise subject to capture and detention, but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.

*Id.* at 30–31, 63 S.Ct. 1. Second, if we revisit the last sentence quoted above, it appears that the Court touched directly on the subject at issue in this case when it said that "[u]nlawful combatants are likewise subject to capture *and detention," id.* at 31, 63 S.Ct. 1 (emphasis added). Although the issue of detention alone was not before the Court in *Quirin,* I read the quoted sentence to mean that as between detention alone, and trial by a military tribunal with exposure to the penalty actually meted out to petitioners in *Quirin*— death—or, at the least, exposure to a sentence of imprisonment intended to punish and deter, the Court regarded detention alone, with the sole aim of preventing the detainee from rejoining hostile forces—a consequence visited upon captured lawful combatants—as certainly the lesser of the consequences an unlawful combatant could face. If, as seems obvious, the Court in fact regarded detention alone as a lesser consequence than the one it was considering—trial by military tribunal—and it approved even that greater consequence, then our case is *a fortiori* from *Quirin* as regards the lawfulness of detention under the law of war. *See also Colepaugh v. Looney,* 235 F.2d 429, 432 (10th Cir.1956) (American citizen who entered the United States to commit hostile acts in aid of Germany during World War II could be tried by military commission: "[B]oth the executive and judicial branches of the government have recognized a clear distinction between a lawful combatant subject to capture and detention as a prisoner of war, and an unlawful combatant, *also subject to capture and detention,* but in addition 'subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.' " (citing *Quirin,* 317 U.S. at 31, 63 S.Ct. 1) (emphasis added)); *In re Territo,* 156 F.2d 142, 145 (9th Cir. 1946) (American citizen captured in Sicily while serving in enemy army could be held as prisoner of war in California for duration of hostilities).

*Quirin* spoke to the issue of Presidential authority as well, albeit obliquely, and not as Padilla and the amici would have me read that case. They argue that when the Court wrote that the Constitution "invests the President ... with the power to wage war which Congress has declared," *id.* at 26, 63 S.Ct. 1, that was meant to confine the holding in that case to formally declared wars, such as World War II, and means that *Quirin* is irrelevant to this case. However, the logic of that argument requires a finding that *Quirin sub silentio* overruled the *The Prize Cases,* discussed at page 589 above. That breathtaking conclusion is unwarranted, however, both because it is unreasonable to believe that the Court would deal so casually with its own significant precedents, and because, as noted above, *The Prize Cases* have been found authoritative since *Quirin,* and appear to be very much alive.

The *Quirin* Court found it "unnecessary for present purposes to determine to what extent the President as Commander in Chief has constitutional power to create military commissions without the support of Congressional legislation. For here Congress has authorized trial of offenses against the law of war before such commissions." *Quirin,* 317 U.S. at 29, 63 S.Ct. 1. However, the Court did suggest that the President's decision to try the saboteurs before a military tribunal rested at least in part on an exercise of Presidential authority under Article II of the Constitution:

By his order creating the present Commission [the President] has undertaken

to exercise the authority conferred upon him by Congress, and also such authority as the Constitution itself gives the Commander in Chief, to direct the performance of those functions which may constitutionally be performed by the military arm of the nation in time of war. *Id.* at 28, 63 S.Ct. 1.

Here, the basis for the President's authority to order the detention of an unlawful combatant arises both from the terms of the Joint Resolution, and from his constitutional authority as Commander in Chief as set forth in *The Prize Cases* and other authority discussed above. Also as discussed above, no principle in the Third Geneva Convention impedes the exercise of that authority.

B. *Is Padilla's Detention Barred by Statute?*

Whatever may be the President's authority to act in the absence of a specific limiting legislative enactment, Padilla and the amici argue that 18 U.S.C. § 4001(a) bars his confinement in the circumstances present here, and the ACLU argues that Padilla's confinement is barred as well by the USA Patriot Act, Pub.L. No. 107–56, 115 Stat. 272 (2001) (the "Patriot Act"). However, as set forth below, § 4001(a), which by its terms applies to Padilla, bars confinement only in the absence of congressional authorization, and there has been congressional authorization here; the Patriot Act simply does not bear on this case.

 Taking the second argument first, the Patriot Act permits the detention of aliens suspected of activity endangering the security of the United States, for a period limited to seven days. *See* 8 U.S.C. § 1226A(a)(5) (2000). According to the ACLU, had Congress thought that American citizens or even aliens could be detained as enemy combatants, it would never have passed this provision of the Patriot

Act. (*See* ACLU Br. at 8–9) The Patriot Act, however, cannot be read as a comprehensive guide to presidential powers under the Joint Resolution. Because the Patriot Act requires only that the Attorney General have a reasonable ground to believe that an alien is engaging in threatening activity, *id.* § 1126A(a)(3), that Act can be applied to persons who could not be classified as enemy combatants under the law of war. *See Quirin,* 317 U.S. at 45, 63 S.Ct. 1 (acknowledging that a citizen may not be tried by military tribunal if he is not serving a recognized enemy); discussion at page 592, above. The cited portion of the Patriot Act applies to persons as to whom there is alleged to be far less reason for suspicion than there is as to Padilla. Moreover, to accept the ACLU's reading of the cited portion of the Patriot Act is to read that statute as having been intended to undercut substantially the logic of *Quirin.* I refuse to read the statute to accomplish such a stark result.

 Padilla's principal statutory argument is based on 18 U.S.C. § 4001(a), which is broad and categorical:

No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress.

18 U.S.C. § 4001(a) (2000); *see Howe v. Smith,* 452 U.S. 473, 480 n. 3, 101 S.Ct. 2468, 69 L.Ed.2d 171 (1981) ("[T]he plain language of § 4001(a) proscrib[es] detention *of any kind* by the United States, absent a congressional grant of authority to detain.") (emphasis in original).

To avoid the reach of that statute, the government appears to lean heavily on statutory construction arguments that fail to confront the plain language of the statute, and to rest rather lightly on what seems to me the more persuasive position: that Padilla in fact is detained "pursuant to an Act of Congress." Thus, the government argues that reading § 4001(a) to cov-

er Padilla's detention would bring that section in conflict with Article II, section 2, clause 1 of the Constitution, which makes the President "Commander in Chief of the Army and Navy of the United States," U.S. Const., art. 2, § 2, cl. 1, and has been interpreted to grant the President independent authority to respond to an armed attack against the United States. *See The Prize Cases,* 67 U.S. at 668, 2 Black 635 ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force ... without waiting for any special legislative authority."); *see also Hamdi v. Rumsfeld,* 296 F.3d at 281–82 ("The authority to capture those who take up arms against America belongs to the Commander in Chief under Article II, Section II."); *Campbell* 203 F.3d at 27 (Silberman, J., concurring) (collecting authorities for the proposition that "the President has independent authority to repel aggressive acts by third parties even without specific congressional authorization").

The government suggests that because reading the statute to impinge on the President's Article II powers, including detention of enemy combatants, creates a danger that the statute might be found unconstitutional as applied to the present case, a court should read the statute so as not to cover detention of enemy combatants, applying the canon that a statute should be read so as to avoid constitutional difficulty. *See, e.g., Jones v. United States,* 529 U.S. 848, 857, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (citing "the guiding principle that 'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'") (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)).

█ However, this doctrine of constitutional avoidance " 'has no application in the absence of statutory ambiguity.' " *HUD v. Rucker,* 535 U.S. 125, 122 S.Ct. 1230, 1235, 152 L.Ed.2d 258 (2002) (quoting *United States v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 494, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001)). Any other approach, as pointed out in *Rucker,* " 'while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution.' " *Id.* at 1235–36 (quoting *United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). That is, if a court read an ambiguity into an unambiguous statute simply for the purpose of avoiding an adverse decision as to the constitutionality of that statute, the court would be exercising legislative powers and thereby usurping those powers. There is no ambiguity here. The plain language of the statute encompasses all detentions of United States citizens. Therefore, the constitutional avoidance canon cannot affect how the statute is read.

█ The government argues also that because § 4001(a) is in Title 18 of the United States Code, and that title governs "Crimes and Criminal Procedure," Congress could not have intended to impede the President's authority to use the military rather than the civilian law enforcement arm of the government to detain unlawful combatants in wartime. The government proffers, as additional textual evidence, that 18 U.S.C. § 4001(b) gives the Attorney General control over "Federal penal and correctional institutions, except military or naval institutions," 18 U.S.C. § 4001(b) (2000), and reasons that this shows that Congress meant to exclude military detention from the reach of the section. However, § 4001(b) simply limits the Attorney General's responsibility for

prisons to those that are not run by the military. The placement of this section within Title 18 is entirely natural because most detentions result from arrest by law enforcement agencies. This textual argument, too, cannot overcome the plain language of the statute, as read by the Supreme Court in *Howe v. Smith*, cited above.

Although the government struggles unsuccessfully to avoid application of the statute, the government is on firmer ground when it argues that even if § 4001(a) applies, its terms have been complied with. The statute permits detention of an American citizen "pursuant to an Act of Congress." 18 U.S.C. § 4001(a) (2000). If the Military Force Authorization passed and signed on September 18, 2001, is an "Act of Congress," and if it authorizes Padilla's detention, then perforce the statute has not been violated here.

The Joint Resolution is not called an "Act," but that is the only respect in which it is not an "Act." Joint resolutions generally, as their name would suggest, require the approval of both Houses of Congress, and if signed by the President, have the force of law. *See Bowsher v. Synar*, 478 U.S. 714, 756, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) ("The joint resolution, which is used for 'special purposes and ... incidental matters,' makes binding policy and 'requires an affirmative vote by both Houses and submission to the President for approval'—*the full Article I requirements.*" (emphasis added) (citation omitted)). That is to say, there is no relevant constitutional difference between a bill and a joint resolution; both require bicameralism—passage by both Houses, and presentment—submission to the President for signature.

Congress itself has intimated that a joint resolution qualifies as an "Act of Congress." *See* Joint Resolution of Dec. 15, 1981, Pub.L. No. 97–92, § 140, 95 Stat. 1183, 1200 ("Notwithstanding any other provision of law ... none of the funds appropriated by this joint resolution *or by any other Act* shall be obligated or expended to increase, after the date of enactment of this joint resolution, any salary of any Federal judge or Justice of the Supreme Court, except as may be specifically authorized by Act of Congress hereafter enacted." (emphasis added)). A light smattering of cases suggests the same thing. *See Acme of Precision Surgical Co. v. Weinberger*, 580 F.Supp. 490, 501–02 (E.D.Pa.1984) (calling joint resolutions "acts of Congress"); *Louisville & Nashville R.R. v. Bass*, 328 F.Supp. 732, 739 (W.D.Ky.1971) (equating a joint resolution with an "Act of Congress"); *Berk v. Laird*, 317 F.Supp. 715, 723 (E.D.N.Y.1970) (calling the Gulf of Tonkin Resolution an "act of Congress").

Principally because the Joint Resolution complies with all constitutional requirements for an Act of Congress, it should be regarded for purposes of § 4001(a) as an "Act of Congress." *Cf. Hamdi*, 296 F.3d at 281 (concluding that the President acted with statutory authorization in designating Hamdi, an American citizen captured in Afghanistan, as an enemy combatant).

The authority conferred by the Joint Resolution itself is broad. It authorizes the President to "use all necessary and appropriate force against those ... organizations, or persons he determines planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001 ... in order to prevent any future acts of international terrorism against the United States by such ... organizations or persons." Authorization for Use of Military Force, Pub. Law No. 107–40, § 2(a), 115 Stat. 224, 224 (2001). This language authorizes action against not only those connected to the subject organizations who

are directly responsible for the September 11 attacks, but also against those who would engage in "future acts of international terrorism." as part of "such ... organizations." *Id.* As reflected, *inter alia,* in the President's November 13, 2001 order establishing military tribunals, al Qaeda is an organization the President has determined committed the subject acts. Mil. Order of Nov. 13, 2001, 66 Fed.Reg. 57,833 (Nov. 16, 2001). Indeed, in the June 9 Order directing Padilla's detention, the President refers to al Qaeda as "an international terrorist organization with which the United States is at war." June 9 Order at ¶ 2. As discussed above, Padilla is alleged in the June 9 Order to have been an unlawful combatant in behalf of al Qaeda. Also as discussed extensively above, the Third Geneva Convention does not forbid detention of unlawful combatants. Accordingly, the detention of Padilla is not barred by 18 U.S.C. § 4001(a); nor, as discussed above, is it otherwise barred as a matter of law.

## V. CONSULTATION WITH COUNSEL

The government has not disputed Padilla's right to challenge his detention by means of a habeas corpus petition. Although Padilla has the ability, through his lawyer, to challenge the government's naked legal right to hold him as an unlawful combatant on any set of facts whatsoever, he has no ability to make fact-based arguments because, as is not disputed, he has been held incommunicado during his confinement at the Consolidated Naval Brig in Charleston, and has not been permitted to consult with counsel. Therefore, unless I find that the only fact issue Padilla has a right to be heard on is whether the government's proffered facts, taken alone and without right of response, are sufficient to warrant his detention by whatever evidentiary standard may apply—an argument that can be presented by counsel without access to Padilla—I must address the question of whether he may present facts, and how he may do so. As explained below: (i) Padilla does have the right to present facts; (ii) the most convenient way for him to go about that, and the way most useful to the court, is to present them through counsel; and (iii) the government's arguments are insufficient to warrant denying him access to counsel. Therefore, to the extent set forth below, Padilla will be permitted to consult with counsel in aid of prosecuting this petition.

Padilla's right to present facts is rooted firmly in the statutes that provide the basis for his petition. Padilla has petitioned pursuant to 28 U.S.C. § 2241, which, among other things, grants to district courts the power to issue writs of habeas corpus; a related section, 28 U.S.C. § 2243, provides the skeletal outline of procedures to be followed in a § 2241 case. It includes the following:

> Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.

> The applicant or the person detained may, under oath, deny any of the facts set forth in the return or allege any other material facts.

28 U.S.C. § 2243 (2000). A related section, 28 U.S.C. § 2246, allows the taking of evidence in habeas corpus cases by deposition, affidavit, or interrogatories.

Further, both the Federal Rules of Civil Procedure and the Rules Governing § 2254 Cases may be applied in § 2241 habeas corpus cases, in the discretion of the court. *See* Fed.R.Civ.P. 81(a)(2) (rules apply "to proceedings for ... habeas corpus ... to the extent that the practice in such proceedings is not set forth in statutes of the United States and ... has

heretofore conformed to the practice in civil actions"); Rules Governing § 2254 Cases 1(b) (§ 2254 rules may apply in other habeas corpus cases "at the discretion of the United States district court"). This blend of procedures that may be applied makes a habeas corpus case different from the usual civil lawsuit. *See, e.g., Harris v. Nelson,* 394 U.S. 286, 293–94, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) ("It is, of course, true that habeas corpus proceedings are characterized as 'civil.' But that label is gross and inexact. Essentially, the proceeding is unique."). The Supreme Court has praised the flexibility of habeas corpus. *See, e.g., Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) ("It is not now and never has been a static, narrow, formalistic remedy.").

Quite plainly, Congress intended that a § 2241 petitioner would be able to place facts, and issues of fact, before the reviewing court, and it would frustrate the purpose of the remedy to prevent him from doing so.

The habeas corpus statutes do not explicitly provide a right to counsel for a petitioner in Padilla's circumstances, but 18 U.S.C. § 3006A(2)(B) permits a court to which a § 2241 petition is addressed to appoint counsel for the petitioner if the court determines that "the interests of justice so require." 18 U.S.C. § 3006A(2)(B) (2000). I have already so determined, and have continued the appointment of Newman and appointed also Andrew Patel, Esq., as co-counsel.

■ Of course, Padilla has no Sixth Amendment [13] right to counsel in this proceeding. The Sixth Amendment grants that right to the "accused" in a "criminal

proceeding"; Padilla is in the custody of the Department of Defense; there is no "criminal proceeding" in which Padilla is detained; therefore, the Sixth Amendment does not speak to Padilla's situation. Beyond the plain language of the Amendment, "even in the civilian community a proceeding which may result in deprivation of liberty is nonetheless not a 'criminal proceeding' within the meaning of the Sixth Amendment if there are elements about it which sufficiently distinguish it from a traditional civilian criminal trial." *Middendorf v. Henry,* 425 U.S. 25, 38, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976). Such "elements" are present here—notably, that Padilla's detention "does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." *Hendricks,* 521 U.S. at 361–62, 117 S.Ct. 2072. Although *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), recognized a Sixth Amendment right against custodial interrogation without access to counsel, the remedy for violation of this right is exclusion of the fruits of the interrogation at a criminal trial, *id.* at 491, 84 S.Ct. 1758. There being no criminal proceeding here, Padilla could not enforce this right now even if he had it.

■ Nor does the self-incrimination clause of the Fifth Amendment [14] provide any more help to Padilla than the Sixth Amendment in his effort to confer with counsel. Although the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), found in that clause a right to counsel, calling the presence of counsel "the adequate protective device necessary to make the process of police interrogation conform to the dictates

---

**13.** The Sixth Amendment to the Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const., amend. VI.

**14.** That clause states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V.

of the privilege," *id.* at 466, 86 S.Ct. 1602, and "[a]lthough conduct by law enforcement officials prior to trial may significantly impair that right [to avoid self-incrimination], a constitutional violation occurs only at trial." *United States v. Verdugo–Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). That is of no help to Padilla, who does not face the prospect of a trial. *But see Martinez v. City of Oxnard,* 270 F.3d 852 (9th Cir. 2001) (holding that a plaintiff may bring a § 1983 action alleging a violation of Fifth and Fourteenth Amendment rights to be free from police coercion in pursuit of a confession even though statements were not used against him at trial), *cert. granted sub nom. Chavez v. Martinez,* —— U.S. ——, 122 S.Ct. 2326, 153 L.Ed.2d 158 (2002).

■ The Due Process Clause of the Fifth Amendment states that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. Professor Laurence Tribe has commented that, "[w]hat emerges from [the] disparate cases and lines of thought [interpreting the Due Process Clause] is, quite clearly, less than a solidly grounded or coherently elaborated right of judicial access." Laurence H. Tribe, *American Constitutional Law* §§ 10–18, at 759 (2d ed.1988). Finding guidance in the due process clause would require, at a minimum, locating the delicate balance between private and public interests that is the test for finding a due process right, as set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. 893. That is not to say that there are no guides whatever to striking that balance. There are. *See, e.g., Nat'l Council of Resistance of Iran v. Dep't of State,* 251 F.3d 192, 209 (D.C.Cir. 2001) (holding that organizations designated by the Secretary of State as terrorist organizations must have "the opportunity to be heard at a meaningful time and in a meaningful manner,". and must have "the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations"). However, as explained below, the provisions and characteristics of the habeas corpus statute and remedy discussed at pages 76–77 above, and the court's power under the All Writs Act, 28 U.S.C. § 1651(a) (2000), to issue writs in aid of its jurisdiction, provide a statutory basis for decision. Considerations of prudence require that a court avoid a constitutional basis for decision when there exists a non-constitutional alternative. *See Harris v. McRae,* 448 U.S. 297, 306–07, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (cautioning that when a case can be decided based on either a statute or the Constitution, the statute should provide the basis for decision).

■ Part of that non-constitutional alternative lies in the provisions of the habeas corpus statute, and the characteristics of the remedy, discussed at pages 76–77 above, which make it clear that Congress intended habeas corpus petitioners to have an opportunity to present and contest

facts, and courts to have the flexibility to permit them to do so under proper safeguards. Padilla's need to consult with a lawyer to help him do what the statute permits him to do is obvious. He is held incommunicado at a military facility. His lawyer has been told that there is no guarantee even that her correspondence to him would get through. (Newman Aff. of 9/24/02 ¶ 8) Although it is not uncommon for habeas corpus cases to be pursued by petitioners *pro se*, such cases, usually involving challenges to either state convictions under 28 U.S.C. § 2254 or federal convictions under 28 U.S.C. § 2255, almost always are filed after the petitioners already have had the benefit of completed criminal proceedings, and appeals, in which they were represented by counsel. Padilla has had no such benefit here. It would frustrate the purpose of the procedure Congress established in habeas corpus cases, and of the remedy itself, to leave Padilla with no practical means whatever for following that procedure.

The All Writs Act provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (2000). In *United States v. Hayman*, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952), the Supreme Court disapproved of a district court's use of *ex parte* procedures in a habeas corpus case under 28 U.S.C. § 2255 attacking a federal conviction. The Court pointed out that the district court could have used its powers under § 1651(a) in aid of its § 2255 jurisdiction, and ordered the petitioner transported from the district where he was confined so that a hearing could be held:

> The District Court is not impotent to accomplish this purpose, at least so long as it may invoke the statutory authority of federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." An order to secure respondent's presence in the sentencing court to testify or otherwise prosecute his motion is "necessary or appropriate" to the exercise of its jurisdiction under Section 2255 and finds ample precedent in the common law.

*Hayman*, 342 U.S. at 221, 72 S.Ct. 263 (quoting 28 U.S.C. § 1651(a)).

In *Harris v. Nelson*, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), the Supreme Court held that a district court could use its § 1651(a) powers to compel a warden to answer interrogatories posed by a habeas corpus petitioner:

> At any time in the proceedings, when the court considers that it is necessary to do so in order that a fair and meaningful evidentiary hearing may be held so that the court may properly "dispose of the matter as law and justice require," either on its own motion or upon cause shown by the petitioner, it may issue such writs and take or authorize such proceedings with respect to development, before or in conjunction with the hearing of the facts relevant to the claims advanced by the parties, as may be "necessary or appropriate in aid of [its jurisdiction] . . . and agreeable to the usages and principles of law."

*Id.* at 300, 89 S.Ct. 1082 (quoting 28 U.S.C. §§ 2243 and 1651(a)). In the same case, the Court appears to have read broadly the power of a court hearing a habeas corpus petition to fashion remedies under the All Writs Act:

> [T]he habeas corpus jurisdiction and the duty to exercise it being present, the courts may fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage. Where their duties require it, this is the inescapable obligation of the courts. Their authority is expressly

confirmed in the All Writs Act, 28 U.S.C. § 1651.

*Id.* at 299, 89 S.Ct. 1082.

The Court has also read generously the requirement that writs be issued only in aid of a court's jurisdiction. In *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), the Court wrote of that requirement as follows: "[A] distinction between orders in aid of a court's own duties and jurisdiction and orders designed to better enable a party to effectuate his rights and duties ... is specious." *Id.* at 175 n. 23, 98 S.Ct. 364.

I recognize that use of the All Writs Act itself is circumscribed by the requirement that the order be "necessary" in aid of a court's jurisdiction, and that that Act may not be employed to avoid the requirements of an otherwise applicable statute. "Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Pa. Bureau of Corr. v. United States Marshals Serv.*, 474 U.S. 34, 43, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985). However, the habeas corpus statutes do not address "the particular issue at hand."

■ The decision whether to grant or withhold an order under the All Writs Act lies "in the sound discretion of the court." *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25, 63 S.Ct. 938, 87 L.Ed. 1185 (1943). Although, as noted above, the right-to-counsel jurisprudence developed in cases applying the Sixth Amendment does not control this case, there would seem to be no reason why that jurisprudence cannot at least inform the exercise of discretion here. In Sixth Amendment cases, the Supreme Court has stressed repeatedly the importance of counsel to a defendant. *See, e.g., United States v. Gouveia*, 467 U.S. 180, 190, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) ("[T]he right to counsel exists to protect the accused during trial-type con-

frontations with the prosecutor."); *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) ("[A] defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law."). Although the Sixth Amendment does not control Padilla's case, the logic of the underlying case law suggests that discretion under the All Writs Act should be exercised in favor of permitting him to consult with counsel in aid of his petition and, in particular, in aid of responding to the Mobbs Declaration should he choose to do so.

■ The government has argued that affording access to counsel would "jeopardize the two core purposes of detaining enemy combatants—gathering intelligence about the enemy, and preventing the detainee from aiding in any further attacks against America." (Respondents' Resp. to This Ct's 10/21/02 Order at 6) This would happen, the government argues, because access to counsel would interfere with questioning, and because al Qaeda operatives are trained to use third parties as intermediaries to pass messages to fellow terrorists, even if "[t]he intermediaries may be unaware that they are being so used." (*Id.* at 7)

However, access to counsel need be granted only for purposes of presenting facts to the court in connection with this petition if Padilla wishes to do so; no general right to counsel in connection with questioning has been hypothesized here, and thus the interference with interrogation would be minimal or nonexistent. As to the possibility that Padilla might use his lawyers to pass messages to others, there are several responses to that conjecture. First, accepting that conjecture at face value and across the board proves far too much: by the government's logic, no indicted member of al Qaeda facing trial in

an Article III court should be allowed to consult with counsel—a result barred by the Sixth Amendment. Second, I have read both the Mobbs Declaration and the Sealed Mobbs Declaration, the latter only for the purpose of assessing the government's access-to-counsel argument; the government's conjecture is, on the facts presented to me in those documents, gossamer speculation. Although the government presents facts showing that Padilla had contact with and was acting on behalf of al Qaeda, there is nothing to indicate that Padilla in particular was trained to transmit information in the way the government suggests, or that he had information to transmit. Third, Padilla has already had meetings with counsel in New York, and thus whatever speculative damage the government seeks to prevent may already have been done. Fourth, there is no reason that military personnel cannot monitor Padilla's contacts with counsel, so long as those who participate in the monitoring are insulated from any activity in connection with this petition, or in connection with a future criminal prosecution of Padilla, if there should ever be one. The U.S. Bureau of Prisons has adopted such procedures with respect to incarcerated defendants who present a similar danger. *See* Prevention of Acts of Violence and Terrorism, 28 C.F.R. § 501.3(a) (2002) (special procedures to be used if "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily harm to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons"). One would think that such procedures would go a long way toward preventing Padilla from transmitting information through his lawyers to others. Finally, Padilla's lawyers themselves are members of this court's Criminal Justice Act panel who have appeared before this court in numerous cases. In addition to being able advocates, they have

conducted themselves at all times in a fashion consistent with their status as—to use the antique phrase—officers of the court. There is nothing in their past conduct to suggest that they would be inclined to act as conduits for their client, even if he wanted them to do so.

Even giving substantial weight, as I do, to the President's statement in the June 9 Order that Padilla is "a continuing, present and grave danger to the national security of the United States" and that his detention "is necessary to prevent him from siding with al Qaeda in its efforts to attack the United States," there has been no fact presented to me that shows that the source of that danger is the possibility that Padilla will transmit information to others through his lawyers. By contrast, Padilla's statutorily granted right to present facts to the court in connection with this petition will be destroyed utterly if he is not allowed to consult with counsel. On the facts presented in this case, the balance weighs heavily in Padilla's favor.

I do not believe that the decision in *Hamdi v. Rumsfeld*, 296 F.3d 278 (4th Cir.2002), alters the balance in the government's favor. In that case, the Court of Appeals for the Fourth Circuit reversed the order of a district court directing the government to permit unmonitored access by counsel to a detainee captured in Afghanistan and held at a Navy brig in Norfolk, Virginia. The order was rendered without benefit of briefing or argument, and with "little indication in the order (or elsewhere in the record for that matter) that the court gave proper weight to national security concerns." *Id.* at 282. According to the Fourth Circuit, "[t]he peremptory nature of the [District Court's] proceedings st[ood] in contrast to the significance of the issues before the court." *Id.* No such access is to be granted here, and the court has had the full benefit of

the government's submissions, both sealed and unsealed. Further, Padilla's situation appears to differ from Hamdi's in that he had access to counsel after his capture but before his designation as an enemy combatant, and thus no potential prophylactic effect of an order barring access by counsel could have been lost.

Because this court has jurisdiction over Padilla's petition, and because the procedure outlined by the applicable statutes cannot be followed unless Padilla is permitted to consult with counsel, respondent Secretary Rumsfeld will be directed to permit Padilla to consult with counsel solely for the purpose of submitting to the court facts bearing upon his petition, under such conditions as the parties may agree to, or, absent agreement, such conditions as the court may direct so as to foreclose, so far as possible, the danger that Padilla will use his attorneys for the purpose of conveying information to others.

## VI. THE STANDARD APPLICABLE TO THIS COURT'S REVIEW AND THE FACTS THE COURT MAY CONSIDER

Before Padilla consults with counsel for the purpose of submitting facts to the court in aid of his petition, it would seem essential for him to know what standard the court will apply in determining whether whatever facts the government has presented are sufficient to warrant the finding in the President's June 9 Order that Padilla is an unlawful combatant. In addition, it would be helpful for Padilla to know, at least in a general sense, what the court will consider in that calculus other than what appears in the Mobbs Declaration— in particular, whether the court will consider the Sealed Mobbs Declaration. Unless he has some idea as to both of these subjects, he cannot decide what sort of factual presentation he must make, or indeed whether he wishes to stand mute

rather than try to present any facts at all. The standard the court will apply in deciding the sufficiency of the government's showing is described below. In addition, I do not believe it necessary to decide now whether to consider the Sealed Mobbs Declaration. For the reasons explained below, Padilla can determine whether to submit facts, and frame those facts, solely based on the Mobbs Declaration and without knowing precisely the content of the sealed submission.

### A. Deference Due the President's Determination

▇▇▇ Padilla does not seem to dispute that courts owe considerable deference, as a general matter, to the acts and orders of the political branches—the President and Congress—in matters relating to foreign policy, national security, or military affairs. Nor could he. The Court of Appeals for the Fourth Circuit wrote as follows on that subject when it considered, and reversed, the order discussed immediately above, peremptorily granting to a detained combatant, captured during military operations in Afghanistan, unmonitored access to counsel:

> The order [under review] arises in the context of foreign relations and national security, where a court's deference to the political branches of our national government is considerable. It is the President who wields "delicate, plenary and exclusive power ... as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress." And where as here the President does act with statutory authorization from Congress, there is all the more reason for deference. Indeed, Articles I and II prominently assign to Congress and the President the shared responsibility for military affairs. See U.S. Const. art. I,

§ 8; art. II, § 2. In accordance with this constitutional text, the Supreme Court has shown great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs. This deference extends to military designations of individuals as enemy combatants in times of active hostilities, as well as to their detention after capture on the field of battle. The authority to capture those who take up arms against America belongs to the Commander in Chief under Article II, Section 2. As far back as the Civil War, the Supreme Court deferred to the President's determination that those in rebellion had the status of belligerents. And in World War II, the Court stated in no uncertain terms that the President's wartime detention decisions are to be accorded great deference from the courts.

*Hamdi,* 296 F.3d at 282 (citations omitted). Instead of disputing general principles, Padilla seeks to take his case outside their reach. Thus, he argues variously (i) that the President lacks statutory authority to act because Congress refrained in the Joint Resolution from declaring war, the Joint Resolution is limited only to those directly involved in the September 11 attacks, and the Patriot Act rather than the Joint Declaration should be read to control his case (Petitioners' Br. in Supp. of Am. Pet. and in Resp. to Respondents' Mot. to Dismiss at 9–12, 17–18); and (ii) the President lacks constitutional authority because his constitutional powers as Commander in Chief and as sole authority in the conduct of foreign affairs do not reach the capture of a United States citizen on American soil,

and his detention as an enemy combatant (*id.* at 13–15, 16–17).

Padilla insists that this court conduct a "searching inquiry" into the factual basis for the President's determination that Padilla is an enemy combatant, lest the court "rubber stamp" the June 9 Order and thereby enforce a "Presidential whim." (*Id.* at 22, 32) In essence, Padilla argues that he is entitled to a trial on the issue of whether he is an unlawful combatant or not.[15]

However, as set forth above, Padilla has lost the legal arguments he relies on to remove this case from the reach of the principles described by the Fourth Circuit in *Hamdi,* cited above. The President, for the reasons set forth above, has both constitutional and statutory authority to exercise the powers of Commander in Chief, including the power to detain unlawful combatants, and it matters not that Padilla is a United States citizen captured on United States soil. *See supra* pp. 588–90. In his frequently-cited concurrence in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), Justice Jackson described three degrees of Presidential authority. First, when the President acts pursuant to express or implied authorization by Congress, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* at 635, 72 S.Ct. 863. Second, when he acts absent either approval or disapproval from Congress, "he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which

---

**15.** In an affidavit submitted "on information and belief" (Newman Aff. of 9/24/02 ¶ 1), Newman states what appears to be her belief, although not the information that led to it, that Padilla had "traveled to Chicago to visit with his son," and then "planned to travel to

Florida to visit other members of his family." (*Id.* ¶¶ 2, 3) That affidavit does not deny the allegations in the Mobbs Declaration relating to Padilla's activities in Afghanistan and Pakistan.

its distribution is uncertain." *Id.* at 637, 72 S.Ct. 863. Third, when a President acts in a way incompatible with Congress's express or implied will, "his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* In the decision to detain Padilla as an unlawful combatant, for the reasons set forth above, the President is operating at maximum authority, under both the Constitution and the Joint Resolution.

Notwithstanding *Hamdi,* and the cases it cites—which are, for the most part, the cases cited in support of the above findings as to the President's authority—it would be a mistake to create the impression that there is a lush and vibrant jurisprudence governing these matters. There isn't. *Quirin* offers no guidance regarding the standard to be applied in making the threshold determination that a habeas corpus petitioner is an unlawful combatant. Because the facts in *Quirin* were stipulated, *see Quirin,* 317 U.S. at 19, 63 S.Ct. 1, the *Quirin* Court moved directly to the legal principles applicable to unlawful combatants, and then to the application of those principles to the undisputed facts. Other controlling cases date to World War II, the Civil War, and even further back. As Justice Jackson observed in *Sawyer,* "[a] judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power as they actually present themselves." *Sawyer,* 343 U.S. at 634, 72 S.Ct. 863. In this case, that poverty reflects, in part, a blessing—the blessedly placid history this country has enjoyed. The last time this country experienced widespread mayhem was during the Civil War; the last time a foreign army marched here was during the War of 1812.

However, if the case law seems sparse and some of the cases abstruse, that is not because courts have not recognized and do not continue to recognize the President's authority to act when it comes to defending this country. Recall that in *Zadvydas v. Davis,* cited above, even as the Supreme Court placed limits on the government's authority to detain immigrants awaiting deportation, *Zadvydas,* 533 U.S. at 691–97, 701, 121 S.Ct. 2491, the Court was careful to point out that the case before it did not involve "terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters of national security," *id.* at 696, 121 S.Ct. 2491. The "political branches," when they make judgments on the exercise of war powers under Articles I and II, as both branches have here, need not submit those judgments to review by Article III courts. Rather, they are subject to the perhaps less didactic but nonetheless searching audit of the democratic process.

*Zadvydas* was decided at the end of June 2001, less than three months before the September 11 attacks, and the language now seems to convey ominous prescience. To the extent that the Court took pains to limit the rule it was creating so as to exclude cases involving "terrorism or other special circumstances" warranting "heightened deference to the judgments of the political branches," the quoted language cannot be dismissed as dictum. If it is dictum, it is the sort of considered dictum to which lower courts such as this one must pay particular heed. *See* Judge Newman's opinion in *United States v. Oshatz,* 912 F.2d 534, 540 (2d Cir.1990) (distinguishing considered dictum from peripheral observations).

The deference to which the Supreme Court and the Fourth Circuit refer is due not because judges are not personally able to decide whether facts have been estab-

lished by competent evidence, or whether those facts are sufficient to warrant a particular conclusion by a preponderance of evidence, or by clear and convincing evidence, or beyond a reasonable doubt. Indeed, if there is any task suited to what should be the job skills of judges, deciding such issues is it. Rather, deference is due because of a principle captured in another "statement of Justice Jackson—that we decide difficult cases presented to us by virtue of our commissions, not our competence." *Dames & Moore v. Regan,* 453 U.S. 654, 661, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). That principle applies equally to the case a judge feels unqualified for but must decide, as to the case a judge feels well qualified for but may not decide. The commission of a judge, as *The Prize Cases,* the other authority cited at pages 48–67 above, and the quoted language from *Zadvydas* suggest, does not run to deciding *de novo* whether Padilla is associated with al Qaeda and whether he should therefore be detained as an unlawful combatant. It runs only to deciding two things: (i) whether the controlling political authority—in this case, the President—was in fact exercising a power vouchsafed to him by the Constitution and the laws; that determination in turn, is to be made only by examining whether there is some evidence to support his conclusion that Padilla was, like the German saboteurs in *Quirin,* engaged in a mission against the United States on behalf of an enemy with whom the United States is at war, and (ii) whether that evidence has not been entirely mooted by subsequent events. The first determination—that there is some evidence of Padilla's hostile status—would support the President's assertion in the June 9 Order that he was exercising the power referred to above. That is the "some evidence" test suggested in the government's papers (Respondents' Resp. to and Mot. to Dismiss Am. Pet. at 17), and it

will be applied once Padilla presents any facts he may wish to present to the court.

## B. *The Sealed Mobbs Declaration*

■ There remains the question of whether the court will consider the Sealed Mobbs Declaration not only to help decide whether Padilla presents a particular danger if he is allowed to consult with counsel, as has already been done, but also to help decide whether there was some evidence to support the President's decision to designate him an enemy combatant, and whether such evidence has not become moot. Padilla objects to my doing so, arguing that he has a fundamental right to avoid suffering serious injury based on facts that are not disclosed. Thus, he cites *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), where the Supreme Court reversed denial of a security clearance to the employee of a defense contractor based on confidential reports, with Chief Justice Warren writing for the Court as follows:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.

*Id.* at 496, 79 S.Ct. 1400. Although the government has not discussed *Greene* in its reply papers, the case is distinguishable from this one on several bases, including that the confidential evidence was used before an executive agency and without explicit delegation from Congress or the President. *Id.* at 507, 79 S.Ct. 1400.

Closer to the case at hand is *United States v. Hayman,* discussed at page 82 above, where a district court faced with a claim of ineffective assistance of counsel in

a habeas corpus case held a hearing without having the petitioner present, and then found that counsel had engaged in the conflicted representation with the knowledge and consent of the petitioner. The Supreme Court disapproved and reversed, holding that the district court "did not proceed in conformity with Section 2255 when it made findings on controverted issues of fact relating to respondent's own knowledge without notice to respondent and without his being present." *Hayman,* 342 U.S. at 220, 72 S.Ct. 263; *see also, Walker v. Johnston,* 312 U.S. 275, 285, 61 S.Ct. 574, 85 L.Ed. 830 (1941) (holding that disputed issues of fact cannot be resolved based on affidavits and must be decided based on evidentiary hearings, "the only admissible procedure" for resolving such issues). Although, as the government argues, in military habeas corpus cases "the inquiry, the scope of matters open for review, has always been more narrow than in civil cases," *Burns v. Wilson,* 346 U.S. 137, 139, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (plurality opinion), the Court in *Burns* went to some lengths to discuss the care with which military appellate courts had reviewed the petitioners' claims, *id.* at 144–45, 73 S.Ct. 1045.

Judge Sand's opinion in *United States v. Bin Laden,* 126 F.Supp.2d 264 (S.D.N.Y. 2000), suggests that, rather than dealing with the problem at the level of abstract principle, it may be more useful to examine precisely what the nature is of the confidential submission so as to determine what rights, if any, are compromised if the court considers it. In *Bin Laden,* Judge Sand resolved a motion to suppress electronic surveillance without holding a hearing, based in part on *"in camera, ex parte* review of ... sensitive material in the case." *Id.* at 287. He found, as required, that such review was necessary due to the damage that could be caused by disclosure of the subject information, *id.,* and also that the issues before him were not factu-

ally complex and were predominantly legal, so that the "benefit [to the court] of holding an adversary hearing was substantially lessened," *id.* He noted that the question before him was whether the searches in question were conducted for foreign intelligence purposes or law enforcement purposes, and that resolving that question "required that the Court review a limited (and manageable) number of documents." *Id.* Judge Sand upheld withholding disclosure of the classified material before him even to defense attorneys who had clearance to review certain classified documents, noting that clearance to see certain classified documents does not necessarily mean clearance to see all such documents. *Id.* at 287 n. 27.

Of course, I recognize that Padilla is not pressing his objection simply to give the court the benefit of the adversary process, and that he raises an issue of fairness. However, the Sealed Mobbs Declaration does not engage issues of fairness to the extent that might at first be supposed because it does not broaden the nature of the accusations against Padilla beyond the bounds of the Mobbs Declaration itself, nor does it refer to conduct by Padilla that is not described in the Mobbs Declaration. Instead, other than identifying one or more of the sources referred to only in cryptic terms in the Mobbs Declaration, the sealed document simply sets forth objective circumstantial evidence that corroborates the factual allegations in the Mobbs Declaration. Padilla's access to the unclassified Mobbs Declaration gives him all the notice necessary to meet the allegations of whom he had contact with and what he did, or to explain why those allegations are now moot. Padilla is not in a position to dispute the government's claim that disclosure of the Sealed Mobbs Declaration "could compromise intelligence gathering crucial to the ongoing war effort by revealing sources and by divulging

methods of collecting intelligence." (Respondents' Resp. to This Ct's 10/21/02 Order at 15)

Whatever outcome might result from the discussion above, I need not reach the issue of whether to consider the Sealed Mobbs Declaration now. If, after Padilla has had an opportunity to contest the unsealed Mobbs Declaration, I find that the government has failed to meet the some evidence standard, I will decide whether to consider the sealed document. At that point, I will have two options: (1) I could find that it is impermissible to use the sealed document without giving Padilla access to it, in which case the government will have the option of withdrawing the submission; or (2) I could consider the sealed document *in camera*. Before Padilla has disputed any facts, it would be premature to choose between these options.

\* \* \* \* \* \*

To recapitulate: (i) Newman may pursue this petition as next friend to Padilla, and the government's motion to dismiss for lack of standing therefore is denied; (ii) Secretary Rumsfeld is the proper respondent in this case, and this court has jurisdiction over him, as well as jurisdiction to hear this case, and the government's motion to dismiss for lack of jurisdiction, or to transfer to South Carolina, is denied; (iii) the President is authorized under the Constitution and by law to direct the military to detain enemy combatants in the circumstances present here, such that Padilla's detention is not *per se* unlawful; (iv) Padilla may consult with counsel in aid of pursuing this petition, under conditions that will minimize the likelihood that he can use his lawyers as unwilling intermediaries for the transmission of information to others and may, if he chooses, submit facts and argument to the court in aid of his petition; (v) to resolve the issue of whether Padilla was lawfully detained on the facts present here, the court will examine only whether the President had some evidence to support his finding that Padilla was an enemy combatant, and whether that evidence has been mooted by events subsequent to his detention; the court will not at this time use the document submitted *in camera* to determine whether the government has met that standard.

The parties will discuss and arrange the conditions for defense counsel's consultation with Padilla, and will attend a conference on December 30, 2002, at 9:15 a.m., in Courtroom 21B of the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, to report on the results of those discussions and arrangements, and to schedule further proceedings in this case.

SO ORDERED.